THE NEW JERSEY AND NEW ENGLAND TELEGRAPH COMPANY

*v.*

THE BOARD OF FIRE COMMISSIONERS OF JERSEY CITY.

1. Public agents can only bind the municipality which they represent when they act within the limits of their chartered authority.

2. A municipal corporation may always interpose successfully the defence of *ultra vires* to a contract not within the scope of its chartered powers.

3. If public agents concede privileges they must restrict the concession to ·such as may be given, without detriment to the public. This the party to whom the concession is made is bound to understand.

---

On application for an injunction, heard on bill and affidavit, .and depositions taken on notice.

*Mr. Flavel McGee,* for motion.

*Mr. Allen McDermott, contra.*

VAN FLEET, V. C.

The complainants are the owners of a line of electric telegraph, extending from the city of New York to the city of Philadelphia. One of their wires is used for the transmission of messages between the stock exchanges of the two cities. The complainants aver that no telegraphic wire in the United States is of greater commercial importance than this one. The object of their bill is to prevent the defendants from destroying a part of their line.

The facts material to the question submitted for judgment may be summarized as follows: Prior to the erection of the complainants' line through Jersey City, the defendants had erected a telegraph in Jersey City, which they used for the purposes of their department. Some of their poles were out of repair, and required to be replaced by new ones. The complainants intended to construct a part of their line through the same streets in which the defendants' line had been constructed. The complainants do not say, in their bill, that they had obtained permission from the common council of Jersey City to erect their line through these streets. The complainants proposed to an officer of the defendants, known by the name of superintendent of telegraph, that they would remove such of the defendants' poles as were worn out, and put in their places poles large enough for the use of both parties, and would thereafter keep the poles in repair, replace them when worn out, and be charged, in all respects, with their care; and would also give the defendants the right to hang their wires on any other poles which they might erect in any other part of the city, on condition that they should have the right to hang their wires on the defendants' poles. The superintendent told the complainants that he had no authority to accept their proposal, but he promised them that he would report it to the proper committee of the defendants. It was not reported to the board, nor to any com-

mittee of the board, but the superintendent reported it to two members of the board—first to the president of the board, who directed him to report it to Commissioner Speck, and he did so, accordingly. Commissioner Speck, after going over part of the route, directed the superintendent to accept the offer. The complainants, immediately after being informed of Commissioner Speck's direction, furnished the necessary men and material, and the old poles were removed and new ones erected, and the wires of both lines were hung upon them. The work was all done at the complainants' cost, but under the direction of defendants' superintendent. The complainants say their expenditure exceeded $1,200.

At this point it is important to state that, while the board of fire commissioners consisted of six members, but a single member assented to the complainants' interference with their telegraph. Four of its members, so far as the bill shows, never heard of the complainants' proposition until after the work had been completed. It is certain the complainants' proposition was never laid before the board as a body. It is equally clear that the board could only act when duly convened as a body. It is, therefore, needless to say that the action of the complainants in removing the old poles and substituting new ones was wholly unauthorized.

The events just described all occurred before September 1st, 1880. On that date a permanent committee of the board, called the committee on telegraph and fuel, were directed to investigate the action of the complainants. The resolution giving this direction stated that the complainants had acted without authority. The next day (September 2d) the complainants wrote a letter to the defendants explaining their conduct, and on the 15th of the same month the board, in conformity to the recommendation of the committee having the matter in charge, invited the corporation attorney and the officers of the complainants to meet with them at their next meeting. That meeting was held September 22d, and the action of the board, in relation to the matter under consideration, is recorded on their minutes, as follows:

" Commissioner Speck reported that the committee on telegraph and fuel recommended that the right and use of the poles erected by the New Jersey and New England Telegraph Company, touching our line, be transferred to the fire department, and in return this board will grant permission to the said New Jersey and New England Telegraph Company to place their wires thereon, provided there is no interference with the wires of this department. On motion, the reported was received and adopted, and the clerk was directed to notify the New Jersey and New England Telegraph Company."

A copy of this minute was sent to the complainants the next day (September 23d), and six days afterwards (September 29th) they wrote to the defendants, stating that while the terms of the agreement set forth in their communication were not as they understood them originally, yet they saw no good reason why they should not accept them, and they did thereby accept them. The next day (September 30th) the clerk of the defendants wrote to the complainants, stating that their letter of the 29th had been laid before the board, and that the board had directed him to say, in reply, that the board would not enter into a contract with the complainants until they were convinced that the complainants' wires would not interfere with the telephone wires of the department.

No further communication passed until October 20th, 1880, when the complainants were informed that the board, sitting as a committee of the whole, were of opinion that the use of the poles by the complainants would interfere with the working of the telephone of the department, and by the same communication they were notified that the committee on telegraph and fuel had been ordered to have the poles erected by the complainants removed, and the poles belonging to the department restored. Nothing further was done by either party until November 18th, 1880, when the defendants notified the complainants that unless the poles erected by them were removed at once, the department would take measures to have them removed. Thereupon the complainants asked this court to protect them against the consequences of the acts threatened by the defendants.

The complainants put their right to protection upon a contract. They contend that the defendants have made a contract with them, giving them the right to hang their wires on the defendants' line, while the defendants deny both the fact of the

contract, and their capacity to make one of the character claimed. There can be no doubt that the injury threatened belongs to the class which it is the duty of this court to prevent *in limine*. If the complainants' wires are severed at a single point, it is obvious that their line, between its principal termini, will be rendered utterly useless. The mischief threatened will, if committed, occasion serious and irreparable loss. It is equally clear, that if the contract affirmed by the complainants is one which the defendants were not authorized to make, it is void. They are public agents, and can only bind the municipality which they represent when they act within the limits of their chartered authority. A municipal corporation may always interpose, successfully, the defence of *ultra vires* to a contract not within the scope of its chartered powers.

The complainants' right to an injunction must depend, I think, entirely upon whether or not they have shown a valid contract. The power of the defendants to make a contract I do not think can be the subject of much doubt. By the charter of Jersey City, they are given the entire control and management of the fire telegraph and other apparatus appertaining to the fire department (*P. L. of 1871 p. 1142*, § *114*), and also power to purchase and hold any personal property they may deem necessary for the purpose of extinguishing fires. *Id. 1144* § *117*. These provisions, I think, give them power to repair and rebuild their line of telegraph. This necessarily involves authority to make contracts for material and labor. Whether they can lawfully agree to pay by a concession of privileges, which will confer upon some other person authority to erect telegraph poles in the streets, without the permission of the common council, is quite another question. I shall, however, for the purposes of this discussion, assume that the defendants have power to make such a contract as that which the complainants claim was made in this case.

The test, then, by which the complainants' claim must be tried, is, Have they shown a contract? The facts are free from dispute. The complainants cannot claim that they expended their money upon the faith of a promise. They had no promise

from the defendants. Their acts in removing the defendants'
poles and substituting their own were entirely unauthorized;
they were, in fact, acts of unlawful interference. That they
were done under the superintendence of one of the defendants'
officers, does not at all change their legal character. He acted
without authority, entirely outside of his powers, and his acts
were, therefore, those of an unlawful intermeddler. The com-
plainants are, in my opinion, without a particle of equity, unless
it can be found in the action of the defendants on the 22d of
September, 1880. On that date the defendants did inform the
complainants that they would be willing, in a certain contin-
gency, to make a contract with them. Their action, as I inter-
pret it, amounted to this: They said to the complainants that,
if the complainants would transfer to them the poles which they
had erected, they would grant to the complainants the right to
place their wires on them, provided the placing of their wires
on them did not interfere with the efficiency of the telegraph for
the uses of their department. This, in my opinion, was the only
contract, for a joint use of their line, the defendants had any
authority to make. They were public agents, charged with im-
portant public duties. Emergencies were possible, when the
safety of the public would depend largely upon the celerity and
thoroughness with which they performed their duties. They
were given the control of the telegraph as a means to enable
them to do their duty. All this the complainants knew. They
also knew that the defendants could make no arrangement with
them, or with any other person, by which they surrendered the
control of the telegraph, or allowed it to be used for any pur-
pose which might impair its efficiency as an arm of the public
service; and that, if they should attempt to do so, even by a
contract executed with the utmost solemnity, their act would be
plainly *ultra vires.* When the complainants were informed what
kind of a contract the defendants were willing to enter into, they
at once assented to its terms, and this, the complainants insist,
completed the contract, and from thenceforth both parties were
bound by it. But is this true as a matter of fact? In other
words, did the parties understand that the defendants, by their

action of September 22d, meant to propose a contract which should have binding force from the moment the complainants assented to it? So far as the defendants are concerned, they give a conclusive answer to this question by their conduct. Immediately upon being informed by the complainants that they were willing to agree to the terms mentioned, the defendants notified them that they were not yet ready to conclude a contract, and would make none until they were satisfied that they could do so without impairing the efficiency of the telegraph for the public service. The complainants did not dissent; they said nothing. Their conduct, in this respect, is important, when we remember that the contract was entirely their project, and that they were so eager to make it that they actually proceeded to execute it before the defendants had commenced its negotiation. It must also be remembered that the complainants were endeavoring to induce the defendants to condone a trespass. The defendants were willing to grant condonation conditionally. They were willing to overlook the trespass and give the complainants the right to use the poles which they had erected, but only in the event such use did not, in their judgment, interfere with the use of the telegraph by the department. This the complainants were bound to understand from the language of the resolution.

But, aside from all other matters, I think the complainants were bound to understand, from the nature of the defendants' powers and duties, that the question whether the complainants' wires could be put upon the defendants' poles without danger of injury to the public service, was one that the defendants were bound to reserve for their own determination. They knew they were dealing with public officers who were charged with delicate and important duties, and that they had been given control of the telegraph for the protection of the public, and that they could neither use it themselves nor allow it to be used for any purpose which involved the slightest risk or hazard to the public. When, therefore, the defendants proposed to allow them to use their line, provided no interference occurred, they were bound to understand that the question whether the public safety would be imperiled by granting them what they wanted or not

was one that the public welfare would not permit to be decided by experiment or trial, but must be left to the judgment of the defendants. That judgment having been exercised, it must be assumed that it has been fairly exercised. It finds that the complainants' wires, if maintained on the defendants' poles, will interfere with the working of the telephone of the department. Such finding is, in my judgment, conclusive against the complainants.

The order to show cause must be discharged, and the complainants' bill dismissed, with costs.