889 A.2d 1144 (2005)
382 N.J. Super. 567
75 SPRUCE STREET, L.L.C., Plaintiff,
v.
NEW JERSEY STATE BOARD OF EDUCATION, Defendant.
Chatham Educational Associates, L.L.C., Plaintiff,
v.
New Jersey State Board of Education, Defendant.
Superior Court of New Jersey, Law Division, Passaic County.
Decided September 21, 2005.
*1145 Thomas Ambrosio for plaintiff 75 Spruce Street, L.L.C.
*1146 Richard A. West, Newark, for plaintiff Chatham Educational Associates, L.L.C.
Allison Colsey Eck for defendant New Jersey State Board of Education (Peter C. Harvey, Attorney General of New Jersey).
The opinion of the court was delivered by
MINIMAN, J.S.C.
Plaintiffs 75 Spruce Street, L.L.C. (75 Spruce), and Chatham Educational Associates, L.L.C. (Chatham) instituted these actions against the New Jersey State Board of Education (State Board) to recover monies due and owing from the Great Falls Charter School (Great Falls). Plaintiffs contend that the trustees of Great Falls were acting as public agents pursuant to § 3 of the Charter School Program Act of 1995, N.J.S.A. 18A:36A-3, when they executed contracts with plaintiffs. They urge that the State Board is bound by these contracts because the Great Falls trustees' status as public agents renders the State Board liable for amounts due under the Great Falls contracts. Plaintiffs also contend that there were express or implied-in-fact contracts between them and the State Board, rendering the Board liable for breaches of the contracts by Great Falls.
The State Board moved for summary judgment in both cases contending that it has no responsibility for the debts of Great Falls.[1] The court concludes that the language and intent of the Charter School Program Act, N.J.S.A. 18A:36A-1 to -18, does not support plaintiffs' position that the public-agent status of charter school boards of trustees allows them to bind the State Board with contracts executed in the name of the charter school. The court also concludes that there was no privity of contract between plaintiffs and the State Board nor was there any express or implied-in-fact contract between plaintiffs and the State Board. The State Board is entitled to the immunity conferred by § 3 of the New Jersey Contractual Liability Act, N.J.S.A. 59:13-3, and both cases are hereby dismissed.
On January 15, 2003, the Commissioner of Education approved the application of Great Falls for a charter school contingent upon the school taking a planning year with the expectation that the school would begin serving students in the Fall of 2004. The approval was also contingent upon receipt of certain outstanding documentation. The Commissioner advised Great Falls that when all documentation was received and approved, the charter would be granted in accordance with N.J.A.C. 6A:11-2.1(h) through (j).
The following year Great Falls entered into two consulting contracts with Chatham on January 10, 2004. Services were provided to Great Falls under those contracts from January 1, 2004, through August 31, 2004. On July 27, 2004, Great Falls entered into a lease with 75 Spruce for 16,000 square feet of space for a period of eleven months. For purposes of these motions, the court accepts plaintiffs' contentions (1) that the charter for Great Falls was approved by the Commissioner;[2] *1147 (2) that plaintiffs' expectations were that they were dealing with an approved charter school; and (3) that various employees of the State Board were familiar with the contracts Great Falls executed with plaintiffs.
On August 23, 2004, the Commissioner determined from the documents submitted by Great Falls that the school was not in compliance with the Charter School Program Act of 1995, N.J.S.A. 18A:36A, and the implementing regulations, N.J.A.C. 6A:11. As a result, the Commissioner ruled that "[g]iven the deficiencies in the documentation submitted, missing documentation and the persistent failure to adhere to prescribed timelines [sic] in the crucial months leading up the opening of school, a charter will not be granted to the school."
On September 10, 2004, 75 Spruce transmitted a notice of claim to the Commissioner pursuant to N.J.S.A. 59:13-5 contending that the board of trustees of Great Falls was an agent of the State Board, that Great Falls had entered into a triple-net lease for the 2004-05 school year and had had a variety of construction-related services performed by 75 Spruce. It contended that as a result of the revocation of the Great Falls charter, all funding had been terminated and Great Falls was no longer able to perform its contractual obligations with 75 Spruce. Expressing an intent to file a breach of contract claim against the State Board, 75 Spruce asserted that the State Board was liable for $168,000 in rent; about $25,000 in taxes and sewer fees; $28,000 as the security deposit; $24,000 in architectural fees; and other miscellaneous amounts. On October 22, 2004, a similar notice of claim was sent to the Commissioner on behalf of Chatham, which expressed an intent to file a breach of contract claim against the State Board for $62,547.68 due it from Great Falls for consulting services. These lawsuits were instituted thereafter.

The Great Falls Board of Trustees as Public Agents
Chatham and 75 Spruce predicate their argument about the status of the Great Falls Board of Trustees on § 3 of the Charter School Program Act of 1995, N.J.S.A. 18A:36A-3(a), that provides
The Commissioner of Education shall establish a charter school program which shall provide for the approval and granting of charters to charter schools pursuant to the provisions of this act. A charter school shall be a public school operated under a charter granted by the commissioner, which is operated independently of a local board of education and is managed by a board of trustees. The board of trustees, upon receiving a charter from the commissioner, shall be deemed to be public agents authorized by the State Board of Education to supervise and control the charter school.

[(emphasis added).]
Plaintiffs submit that in the absence of binding precedent, legislative history, or a definition of the term "public agents," the expectations of 75 Spruce and Chatham when they entered into the Great Falls contracts should be considered in construing the statute. Great Falls appeared on the State Board's list of approved charter schools, which plaintiffs contend conferred "a significant amount of credibility" to Great Falls. Plaintiffs also contend that they reasonably relied on the charter application approved by the State Board in contracting with Great Falls. Finally, they argue that there is a compelling public policy in favor of protecting creditors and vendors of charter schools and, if plaintiffs are left unpaid, the goal stated in § 2 of the Charter School Program Act, N.J.S.A. 18A:36A-2, to encourage the growth of charter schools, will be impeded.
*1148 Certainly, the statute itself does not define the term "public agent," but no definition was required of such a term. It really can have no meaning other than an agent that has the power to act for and bind a public entity. New Jersey and New England Tel. Co. v. Bd. of Fire Comm'rs of Jersey City, 34 N.J. Eq. 117, 121 (Ch. Div.), aff'd, 34 N.J. Eq. 580 (E. & A. 1881), ("public agents ... can only bind the municipality which they represent when they act within the limits of their chartered authority"). Rather, we must determine the meaning of the sentence: "The board of trustees, upon receiving a charter from the commissioner, shall be deemed to be public agents authorized by the State Board of Education to supervise and control the charter school," N.J.S.A. 18A:36A-3(a), which is a "body corporate and politic" by virtue of N.J.S.A. 18A:36A-6. In construing this sentence, the court is guided by principles of statutory construction, which have recently been concisely summarized by the Supreme Court in DiProspero v. Penn, 183 N.J. 477, 492-93, 874 A.2d 1039 (2005), as follows:
The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of this intent is the statutory language. Frugis v. Bracigliano, 177 N.J. 250, 280, 827 A.2d 1040 (2003). We ascribe to the statutory words their ordinary meaning and significance, Lane v. Holderman, 23 N.J. 304, 313, 129 A.2d 8 (1957), and read them in context with related provisions so as to give sense to the legislation as a whole, Chasin v. Montclair State Univ., 159 N.J. 418, 426-27, 732 A.2d 457 (1999). It is not the function of this Court to "rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language." O'Connell v. State, 171 N.J. 484, 488, 795 A.2d 857 (2002). We cannot "write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment," Craster v. Bd. of Comm'rs of Newark, 9 N.J. 225, 230, 87 A.2d 721 (1952), or "engage in conjecture or surmise which will circumvent the plain meaning of the act." In re Closing of Jamesburg High School, 83 N.J. 540, 548, 416 A.2d 896 (1980). "Our duty is to construe and apply the statute as enacted." Ibid.

A court should not "resort to extrinsic interpretation aids" when "the statutory language is clear and unambiguous, and susceptible to only one interpretation...." Lozano v. Frank DeLuca Const., 178 N.J. 513, 522, 842 A.2d 156 (2004) (internal quotations omitted). On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, "including legislative history, committee reports, and contemporaneous construction." Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75, 861 A.2d 123 (2004) (internal quotations omitted). We may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language. See Hubbard ex rel. Hubbard v. Reed, 168 N.J. 387, 392-93, 774 A.2d 495 (2001).
The expectations of 75 Spruce and Chatham play no role in the interpretation of the language of the Charter School Program Act.
The legislative intent in adopting the Charter School Program Act is clearly expressed in § 2:
The Legislature finds and declares that the establishment of charter schools as part of this State's program of public education can assist in promoting comprehensive educational reform *1149 by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom. Specifically, charter schools offer the potential to improve pupil learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of learning outcomes; make the school the unit form for educational improvement; and establish new professional opportunities for teachers.
The Legislature further finds that the establishment of a charter school program is in the best interests of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools.
[N.J.S.A. 18A:36A-2.]
This overall expressed intent sets the stage for construing the sentence in need of interpretation. We view that sentence in context with related provisions. Chasin, supra, 159 N.J. at 426-27, 732 A.2d 457. Because the board of trustees is authorized by the State Board to supervise and control the charter school and the issue before the court is liability under the Great Falls contracts, provisions regarding the establishment of charter schools and the powers conferred upon them provide context to the disputed language.
In order to establish a charter school, an application must be submitted to the Commissioner and the local board of education. N.J.S.A. 18A:36A-4(c). Among other items, the application must include "[t]he proposed governance structure of the charter school including a list of proposed members of the board of trustees of the charter school...." N.J.S.A. 18A:36A-5(c). In addition, the application must include "[t]he financial plan for the charter school and the provisions which will be made for auditing the school pursuant to the provision of N.J.S.A. 18A:23-1." N.J.S.A. 18A:36A-5(1).
The powers granted to the charter school are delineated in § 6 of the Charter School Program Act:
A charter school established pursuant to the provisions of this act shall be a body corporate and politic with all powers necessary or desirable for carrying out its charter program, including, but not limited to, the power to:
.....
b. Sue and be sued, but only to the same extent and upon the same conditions that a public entity can be sued;
c. Acquire real property from public or private sources, by purchase, lease, lease with an option to purchase, or by gift, for use as a school facility;
d. Receive and disburse funds for school purposes;
e. Make contracts and leases for the procurement of services, equipment and supplies;
f. Incur temporary debts in anticipation of the receipt of funds;
....
h. Have such other powers as are necessary to fulfill this charter and which are not inconsistent with this act or the requirements of the commissioner.
[N.J.S.A. 18A:36A-6.]
In addition, a charter school is required to "operate in accordance with its charter and the provisions of law and regulation which govern other public schools ...." N.J.S.A. 18A:36A-11(a). Funding for charter schools is provided by the school district of residence, which, simply stated, is required to pay directly to the charter *1150 school for each enrolled student an amount equal to 90% of the program budget per pupil. N.J.S.A. 18A:36A-12; In re Grant of the Charter Sch. Application of Englewood on the Palisades Charter Sch., 164 N.J. 316, 335, 753 A.2d 687 (2000).
The Charter School Program Act authorized the board of trustees "to decide matters related to the operations of the school including budgeting, curriculum, and operating procedures, subject to the school's charter." N.J.S.A. 18A:36A-14(a). The board of trustees was also empowered "to employ, discharge and contract with necessary teachers and nonlicensed employees subject to the school's charter." N.J.S.A. 18A:36A-14(b).
Viewed in context, it seems abundantly clear that the sentence, which reads "[t]he board of trustees, upon receiving a charter from the commissioner, shall be deemed to be public agents authorized by the State Board of Education to supervise and control the charter school," can really have only one meaning. The board of trustees upon issuance of a charter becomes a public agent[3]for the charter school, a body corporate and politic. The use of the term "public agent" does not ipso facto make the Great Falls Board of Trustees an agent of the State Board or, for that matter, the Commissioner of Education, the Department of Education or the State of New Jersey. Furthermore, nothing in the Charter School Program Act confers any authority upon the board of trustees to exercise any of the State Board's powers or discharge any of its duties.
Although resorting to extrinsic evidence is unnecessary, the court notes that the legislative history of the Charter School Program Act does not evidence any intent to make the State or any of its offices, departments, divisions, bureaus, boards, commissions or agencies financially responsible for the failures of a charter school.[4] Nor, for that matter, do the rules and regulations promulgated by the Commissioner suggest that the State Board had any financial responsibility for the debts of charter schools. Furthermore, imposing liability on the State Board would be inconsistent with the overall statutory scheme which applies to the Board of Education, the State Board and the Commissioner. None of the provisions of Title 18A impose liability on the State for the expenses of local school districts. See, e.g., N.J.S.A. 18A:11-1; 18A:11-2; 18A:20-1. Charter schools are intended to be local public schools under the supervision and control of their boards of trustees rather than the local boards of education. They receive their funding from the local boards of education and are not a state-operated school for which the State Board does have financial responsibility. N.J.S.A. 18A:7F-5.
Plaintiffs are correct that it is the policy of the State to encourage and facilitate the development of charter schools. That policy underlies the Charter School Program Act. However, the expression of that policy does not support imposing on the State Board financial responsibility for charter schools. Indeed, the policy itself speaks only of the State encouraging and facilitating, not funding and developing, the establishment of charter schools.
Plaintiffs contend that "there is a compelling policy of protecting creditors and *1151 vendors of charter schools" because, absent that protection, the stated goal of encouraging the growth of charter schools will be deterred. They urge that vendors will be reluctant to enter into contracts with new charter schools because the vendors have only a limited ability to evaluate the viability of a brand new project. There is no support for such a "compelling policy" in the language of the statute or its legislative history. Moreover, there are ways to ascertain the viability of a new charter school without assurance from the State Board.
The facts on record show that the contracts with Chatham were executed on January 10, 2004, and the lease with 75 Spruce was executed on July 27, 2004. The approval of the application on January 15, 2003, was contingent on Great Falls taking a planning year with the expectation of serving students in the Fall of 2004. It was also contingent upon receipt of outstanding documentation not included in the school application. Plaintiffs were free to investigate compliance with the documentary requirements. In fact, Ellen Pressman of Chatham met with the Office of Innovative Programs and Schools, New Jersey Department of Education, on July 29, 2003, to discuss the use of federal Cadre 7 grant funds, ostensibly to fund consulting services to be performed by Chatham. Indeed, grant funds are actually received by the charter schools during the start-up phase and vendors can be paid from those funds before the school is operational. Chatham should have assured itself of the availability of grant funds before entering into the January 10, 2004, contracts.
Furthermore, inquiry as to the status of the project could easily have been made by both plaintiffs. At least as to 75 Spruce, the clearest sign of the financial vitality of Great Falls would have been student enrollment.[5] The Commissioner had approved an enrollment of 162, the basis for the fiscal projections for Great Falls. As of August 11, 2004, there were only fifty-four verified enrolled students for the start of school in September. Surely, there were even less enrolled on July 27, 2004. This information was available from Great Falls and would have alerted 75 Spruce to an impending financial disaster. Beyond that, the Charter School Program Act is very specific that "[a] charter school shall not construct a facility with public funds other than federal funds." N.J.S.A. 18A:36A-10. With respect to a school facility project, the term "construct" refers to construction or renovation of a school facility. N.J.S.A. 18A:7G-3. To the extent that 75 Spruce was renovating its space for the school, it should have assured itself that federal funds were available for the cost of same.
Based on all of the foregoing factors, the court concludes that the Great Falls Board of Trustees was not an agent of the State Board. Rather, the board was acting only on behalf of Great Falls, which is responsible for any defaults under its contracts with plaintiffs.

Privity of Contract Between Plaintiffs and the State Board
In light of the conclusion that the board of trustees was not an agent of the State Board, there can be no privity of contract between the State Board and the plaintiffs. Plaintiffs urge that the lack of *1152 privity is not the end of the inquiry, because the court must determine whether the State Board owed a duty to plaintiffs. Zielinski v. Prof'l Appraisal Assocs., 326 N.J.Super. 219, 223-24, 740 A.2d 1131 (App.Div.1999). "The existence of a duty is defined not by the contractual relationship between the parties but, rather, by consideration of foreseeability and fairness." Ibid. [citing Carter Lincoln-Mercury v. EMAR Group, 135 N.J. 182, 196, 638 A.2d 1288 (1994)]. Duties of care have been imposed on professionals in favor of persons who did not engage the professional. Carvalho v. Toll Bros. and Developers, 143 N.J. 565, 573-74, 675 A.2d 209 (1996); Petrillo v. Bachenberq, 139 N.J. 472, 655 A.2d 1354 (1995); Carter Lincoln-Mercury, supra, 135 N.J. at 195-204, 638 A.2d 1288; H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 352, 461 A.2d 138 (1983); Ranier v. Frieman, 294 N.J.Super. 182, 188, 682 A.2d 1220 (App.Div.1996); R.J. Longo Const. Co. v. Schragger, 218 N.J.Super. 206, 209-10, 527 A.2d 480 (App. Div.1987); Albright v. Burns, 206 N.J.Super. 625, 632-33, 503 A.2d 386 (App.Div. 1986). The Appellate Division in Zielinski observed that:
The determination of whether a duty exists is generally considered a matter of law to be decided by the court. The foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care. If the foreseeability of an injured party is established, considerations of fairness and policy then govern whether the imposition of a duty is warranted. Finally, the assessment of fairness and policy "involves identifying, weighing, and balancing several factors  the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution."
[Zielinski, supra, 326 N.J.Super. at 226, 740 A.2d 1131 (citations omitted).]
Plaintiffs urge that the State Board was aware of the Great Falls contracts, that they met and corresponded with plaintiffs' representatives, and therefore had a relationship with the plaintiffs. They contend that the statute allowed for the creation of nonprofit schools with virtually no assets and no ability to make a profit, knowing that the schools would be heavily reliant on grants and subsidies, which compels placing the risk of loss on the State Board. Because the State Board took part in aspects of the Great Falls contracts, it had the opportunity and ability to exercise due care. Finally, they argue that the public interest here is clear because the viability of charter schools depends on their ability to obtain products and services.
This case is a far cry from the cases cited above which have imposed a duty of care on professionals, such as doctors and lawyers, within the scope of the professional's duties. No case has been called to the attention of the court, nor has the court itself found a case, which imposes on the State a duty of care to a third-party with respect to the discharge of duties and responsibility statutorily imposed upon State offices, departments, divisions, bureaus, boards, commissions or agencies. This court will not create such a duty on the facts before it. It is not in the interest of the public to impose liability on the State Board for contractual commitments undertaken by charter schools which failed, refused or neglected to provide the documentation required by the Charter School Program Act and the rules and regulations promulgated thereunder.

Absence of Express or Implied-in-Fact Contracts with Plaintiffs
The State Board correctly contends that plaintiffs are barred from making a claim against it by virtue of the New Jersey Contractual Liability Act. N.J.S.A. 59:13-1 to -10. There, the State of New *1153 Jersey waived its sovereign immunity from liability arising only out of an express contract or a contract implied in fact, and the State barred any recovery for claims based upon implied warranties or contracts implied in law. N.J.S.A. 59:13-3. Being a derogation of sovereignty, the statute must be strictly construed. Allen v. Fauver, 167 N.J. 69, 75, 768 A.2d 1055 (2001).
The State Board can only be held liable to plaintiffs if there was an express written or oral contract between them or a contract implied in fact if such an agreement is manifested by other conduct. Wanaque Borough Sewerage Auth. v. Twp. of West Milford, 144 N.J. 564, 574, 677 A.2d 747 (1996). "[C]ontracts implied in fact are no different than express contracts, although they exhibit a different way or form of expressing assent than through statements or writings." Ibid. Implied promises are found by interpretation of a promisor's words and conduct viewed in light of the surrounding circumstances. Ibid.
Here, there were certainly no express contracts, written or oral, between the State Board and the plaintiffs. There are also no facts before the court that even arguably could support the existence of an implied-in-fact contract. The State Board made no promises to plaintiffs and did not secure or negotiate the Great Falls contracts. The work done under the contracts was not supervised by the State Board to ensure conformance to the contracts. There is no conduct of the State Board from which the court could imply a contract, and nothing in the communications between the State Board and the plaintiffs even remotely implies that the State Board would be responsible for the amounts due under the contracts. In the absence of an express or an implied-in-fact contract, the State Board is immune from suit and a judgment of dismissal is hereby entered in favor of defendant New Jersey State Board of Education and against plaintiffs 75 Spruce Street, L.L.C., and Chatham Educational Associates, L.L.C. The dismissal is with prejudice and without costs.
NOTES
[1] These two cases were consolidated for all purposes by order of May 31, 2005, in light of the identity of legal issues.
[2] The State Board disputes this claim because the January 15, 2003, approval was contingent on receipt of all required documentation and not effective until then. N.J.A.C. 6A:11-2.1(g) and (h). Contingent approval has been expressly approved by the Supreme Court as a reasonable implementation of the Charter School Program Act. In re Grant of the Charter School Application of Englewood on the Palisades Charter School, 164 N.J. 316, 337-38, 753 A.2d 687 (2000). When the contingency was not satisfied, the Commissioner denied final approval of the charter on August 23, 2004. This dispute does not affect the legal issues before the court.
[3] The adjective "public" may have been intended to trigger the protection of the Tort Claims Act, N.J.S.A. 59:1-1 to 59:12-3, which applies to agents as well as employees of public entities. Wright v. State, 169 N.J. 422, 435-36, 778 A.2d 443 (2001).
[4] See generally, Sponsor Statement to S.1796 (1995); Senate Education Committee Statement to S.1796 (1995); Legislative Fiscal Estimate to S.1796 (1995); Sponsor Statement to S.1977 and A.592 (1995).
[5] Although it is not part of the stipulated facts, the decision of the State Board affirming the Commissioner's denial of final approval indicates that 75 Spruce had terminated the lease agreement as of May 31, 2004, as a result of the appellant's failure to pay the security deposit. This is consistent with the notice of claim presented by 75 Spruce which sought to recover an unpaid security deposit in the amount of $28,000.