944 A.2d 675 (2008)
399 N.J. Super. 329
Sopharie LEANG and Song Leang, Plaintiffs-Appellants
v.
JERSEY CITY BOARD OF EDUCATION, Vladimir Ashworth, Charles T. Epps, Jr. (in his capacity as Vice Principal), and Angela Bruno, Defendants-Respondents, and
Sopharie Leang and Song Leang, Plaintiffs-Appellants,
v.
Jersey City Medical Center Mobile Crisis Unit, the Jersey City Medical Center, Defendants-Respondents, and
Jersey City Police Department, John and Jane Does 1-5 being employees of the Jersey City Police Department and City of Jersey City, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 2007.
Decided April 2, 2008.
*680 Daniel W. Sexton, Jersey City, argued the cause for appellants (McLaughlin & Nardi, attorneys; Mr. Sexton, of counsel and on the brief).
Howard M. Nirenberg, Hackensack, argued the cause for respondents Jersey City Board of Education, Vladimir Ashworth, Charles T. Epps, Jr. and Angela Bruno (Nirenberg & Varano, LLP, attorneys; Mr. Nirenberg, of counsel and on the brief; Sandra N. Varano, on the brief).
Monica Vir, Westfield, argued the cause for respondents Jersey City Medical Center and Jersey City Medical Center Mobile Crisis Unit (Lindabury, McCormick, Estabrook & Cooper, attorneys; Catherine J. Flynn, of counsel; Ms. Vir, on the brief).
Before Judges A.A. RODRÍGUEZ, COLLESTER and C.L. MINIMAN.
The opinion of the court was delivered by C.L. MINIMAN, J.A.D.
Plaintiffs Sopharie Leang and her husband Song Leang appeal from a summary judgment dismissing all of their claims against defendants Jersey City Board of Education (the Board), Vladimir Ashworth, Charles T. Epps, Jr., Angela Bruno, Jersey City Medical Center (JCMC) and Jersey City Medical Center Mobile Crisis Unit (MCU).[1] We reverse in part and affirm in part.

I
On May 20, 2003, plaintiffs filed a complaint and asserted the following claims against the Board, Ashworth, Epps and Bruno (collectively, the school defendants):[2] false imprisonment; battery; assault; invasion of privacy; defamation, slander and libel; sexual harassment by Ashworth; breach of employment contract; due process violations; wrongful discharge; and intentional infliction of emotional distress. Song also asserted a per quod claim. On June 27, 2003, an answer to plaintiffs' complaint was filed by the school defendants, which generally denied the allegations and cross-claimed for contribution.
On June 23, 2004, plaintiffs filed a separate complaint against the JCMC and the MCU (collectively, the medical defendants), as well as the Jersey City Police Department (Jersey City PD), the City of Jersey City (the City), and their various John and Jane Doe employees (collectively, the City defendants). This complaint alleged the use of excessive force and abuse of governmental authority, a per quod claim by Song, false arrest, malicious prosecution and intentional infliction of emotional distress. On October 5, 2004, the medical defendants filed a joint answer that generally denied the allegations and sought indemnification from their co-defendants or plaintiffs. On August 12, 2004, the City and the Jersey City PD filed a joint answer in which they generally denied the allegations in the complaint and sought contribution and indemnification. *681 On November 5, 2004, a motion judge ordered that the cases be consolidated.
On September 29, 2005, the medical defendants filed a motion for summary judgment and on October 5, 2005, the school defendants filed a separate motion for summary judgment. The City defendants did not file any motions or responses. Argument was held on those motions on November 7, 2005, and the motions were granted. Because we are reviewing a summary judgment, we must, as we do here, assume that the facts asserted by plaintiffs are true and draw all reasonable inferences in their favor. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Plaintiffs were born in Cambodia, where Sopharie began her university studies. In 1970 she left Cambodia to join Song in Paris. She returned to Cambodia to see her family in 1973 and then rejoined Song in Vienna, where he worked for the United Nations in the Industrial Development Organization. She earned a bachelor's degree in French at the University of Vienna. Because Song was transferred to New York by the United Nations, plaintiffs both moved to New York in 1979. Sopharie became a United States citizen and enrolled in the City University of New York (CUNY) in 1998 as a doctoral candidate in French. While enrolled there, she earned a master's degree in urban education, concentrating in English as a second language (ESL) from the New Jersey City University (NJCU) in 2000. She continued to study as a doctoral candidate in French at CUNY through 2002 but did not complete her thesis.
Sopharie taught ESL in the New York City public schools between 1982 and 2001. English is Sopharie's fifth language after Cambodian, French, German and Spanish, although it is clear from her deposition transcript that she is not entirely fluent in English. After working in the New York City public school system for nineteen years, Sopharie was hired as a "provisional teacher" by the Jersey City Public Schools for the 2001-02 school year and was assigned to Public School 11 (PS 11). Ashworth was also a teacher of ESL at PS 11 and Bruno was the principal of that school. Epps was the State District Superintendent of Education.
Sopharie received six evaluations during the school year, one each in November 2001, February, March and May 2002 and two the following month. In her November 26, 2001, formative observation by Bruno, Sopharie's overall ratings showed "satisfactory" in three "domain" areas, "Planning and Preparation," "Instruction" and "The Classroom Environment," and "unsatisfactory" in one, "Students and Learning." Nevertheless, on December 13, 2001, Bruno recommended to the Associate Superintendent that Sopharie's employment be terminated despite the generally satisfactory ratings Bruno gave her.
Sopharie then received a Provisional Teacher Program formative evaluation from Bruno on February 19, 2002, in which she received sixteen satisfactory ratings, nine needs-improvement ratings and one unsatisfactory rating. This evaluation was not based on any classroom observations subsequent to the November 12, 2001, evaluation. It is not clear from the record on what it was based. It was required to be completed at the end of the tenth week of school yet it was not provided to Sopharie until five and a half months after the beginning of school.
Sopharie's March 27, 2002, formative evaluation done by Maria C. Bustillo contained ratings that were "satisfactory" in one area, "The Classroom Environment," "needs improvement" in two, "Students and Learning" and "Instruction," and "unsatisfactory" in one, "Planning and Preparation." *682 This evaluation was based on classroom observation.
On May 9, 2002, Sopharie received a summative evaluation from Bruno that was "satisfactory" in one area, "needs improvement" in one area, and "unsatisfactory" in two areas. Flavio Rubano, Principal Assigned/Human Resources, in a letter dated May 14, 2002, notified Sopharie that her contract would not be renewed for the 2002-03 school year.
On June 11, 2002, Bruno gave Sopharie her mandatory twentieth-week Provisional Teacher Program Formative Evaluation. She received thirteen satisfactory ratings, ten needs-improvement ratings and three unsatisfactory ratings. Bruno admitted that this evaluation was required to be given after the twentieth week of school, not the thirty-fifth. Thus, it should have been given around January 2002.
Bruno then gave Sopharie a Provisional Teacher Program Summative Evaluation one week later on June 18, 2002. This evaluation was required to be given after thirty weeks of full-time teaching, which would have been around April of 2002. This evaluation also was not based on any classroom observations.
Sopharie testified that she never received any mentoring, although she should have been assigned a mentor, and asked Bruno about it every month.[3] Indeed, the mentoring program was to begin one month after the date of hire and required a support team consisting of at least the principal and the mentor. The mentor was to make five forty-minute contacts biweekly for the first ten weeks of teaching. Thereafter, the mentor was to have four forty-minute contacts every five weeks during the remaining twenty weeks of the program. The mentor was required to complete a "Visitation Form" following each contact.[4]
Sopharie also testified that she was never given the textbooks she was required to use in teaching ESL until the end of March 2002, despite Bruno's direction to Ashworth to provide them to her.[5] She claims that by refusing to give her the textbooks, Ashworth sabotaged her performance. She also claims that PS 11's failure to provide her with the ESL curriculum negatively impacted on her performance.[6] After receiving the June 18, 2002, evaluation, Sopharie set up a meeting with Rubano and brought plaintiffs' long-time family friend, educator and New York attorney, Ellore Karl, Ph. D., to this meeting. He and Sopharie questioned the evaluations, asked why the twenty-week evaluation was not given until the thirty-fifth week of school, and inquired about the absence of mentoring and support.[7]
Not only was Sopharie having difficulty obtaining mentoring and support, she was also being harassed by Ashworth. Sopharie testified that Ashworth would ask *683 her out and "prais[e] her beauty," and was "always oriented to . . . sexual advance." Sopharie wanted "nothing connected to him." At the Christmas party, Ashworth asked Sopharie to sit on his lap. When she refused, he told her that she was "so stubborn like a mule." Ashworth told Sopharie he was bisexual. She told him, "well, that is your problem, your business, I do not want to hear that." Whenever Ashworth made sexual advances, Sopharie would tell him "next life, or, talk business only, talk professional only."
Sopharie complained about Ashworth's behavior to three other teachers who were senior to her and they told her to ignore him. Karl testified that Sopharie mentioned several times that Ashworth "was pestering her." Karl advised her on how best to deflect his advances. As time passed and Sopharie continued to complain about Ashworth's sexually harassing conduct, Karl urged her to complain to the principal. Karl also testified that Sopharie was very fearful of doing that because she perceived that Ashworth and Bruno were very closely allied and Sopharie might lose her position if she complained. Sopharie testified that she "didn't dare" complain to Bruno because Ashworth was "so close to Ms. Bruno."
Sopharie characterized Ashworth as a "[s]upervisor-slash-teacher" who was "so powerful." His position "informally" was below the vice principal, which "mean [sic] that any order that [she was] suppose[d] to do from Ms. Bruno [she] receive[d] from him" and that "it seemed that whatever he say become the law." Ashworth had the key to the materials closet, and Sopharie had difficulty obtaining the books and materials from him that she needed for her work.
Sopharie described an encounter with Ashworth in the hallway on June 10, 2002. She testified that Ashworth asked her if she had changed her decision to go out with him. She then responded as follows:
I said, no, no. And then he said, okay, lady, suit yourself, you will regret forever, I will do something that make you regret your decision for life, it will scar your brain for life. At that time I was so frustrated and annoyed by him, so I said, be my guest, go for it[.]
Sopharie said that two days before the last day of school, Ashworth told her, "I will make you dance and I will drum the music . . . I will beat the drum for you to dance. I said, yeah."
On the last day of school, June 24, 2002, at 8:45 a.m., Ashworth came into the classroom Sopharie shared with Liliana Ortiz. Ortiz and her assistant, Olga Rivera, were in the room, along with the twenty-two students in the class. Sopharie was counting books. Ashworth chatted with Ortiz for approximately thirty-five minutes. Sopharie then described what happened when Ashworth asked her why she had "no voice":
I said, I have laryngitis. . . . And then he said to me, why do you have laryngitis. I said, I don't know, maybe aircondition, maybe stress. Oh, you have stress. Yes, I have stress. I said, well, everyone has stress in a working place. He said, yeah, but you have no voice for a long time. I said, just a few days. And then he said to me . . . why do you have stress. And I said, well, everyone has stress. No, no, not like you. I said, then maybe I take a lot of courses that I have to prepare the final paper, the exam. And he said, oh, you have stress; did you go to the doctor. I said, yes. What did the doctor say. I said, can I finish this work, I cannot finish this work keep talking to you. I said, I count this book, like seven time, I keep counting again and again and again because *684 by talking to you I count this one more time.
. . . .
And then Vladimir said to me . . . what did the doctor say. I said, the doctor said I should rest, I had a lot of stress because of my work at JCU  Jersey City University. And then Vladimir, how much stress, how much stress, huh, huh. I said, yeah, do you know for sure that my doctor said the . . . amount of stress in my body could have killed some people. . . .
. . . .
And then he said, oh, now you want to kill all of us in this room, you kill this one  this four times  look, let me count, one up to ten  wow, 22 people, you want to kill 20 people and plus me and Lillian[a] and the other lady altogether [sic], 22, you say you want to kill all of us. I said, what, what. Then I start to be . . . Surprised. I start to  like a shock that he can twist and distort the subject. I said, Vladimir, . . . stop, stop, stop, stop, do not put your word into my mouth. Oh, you have no sense of humor, you have no sense of humor, dear, this is your last day in the school, we cannot joke with you any more, no. No, no, no, no, I don't know what your intention, I want to correct you that  I said and repeat five times . . . I said, the amount of stress, not the person, the amount of stress in my body the doctor said could have  could have killed some people. You have no sense of humor, dear, you are not funny anymore today. I said, do not distort my word, okay, repeat after me, I said, the amount of stress is the subject. Oh, yeah, yeah, yeah, I know that; my God, you kill with what way, a gun, you kill with bomb. I said, what. I said, I told you that the amount of stress the doctor said that could have killed some people. He said, you see that, you see that, she said that she want to kill each one of you  each one of us. And then everyone laugh. The student laugh, shout out, Mrs. Leang cannot kill student, Mrs. Leang could not even kill the fly, she was so nice, how could she kill each one of us, she only help us.
. . . .
And then everyone laugh because  say that Vladimir joke, Vladimir make humor, Vladimir make like a joking time.
. . . .
And I said, okay, okay, I correct, did you hear me, did I clarify it. Vladimir said, go, lady, go, go, go to take the book to Debbie because you have no sense of humor, I cannot joke with you anymore, you are not funny anymore.
[(Emphasis added).]
Sopharie then returned the books with two students.
By 9:25 a.m. the school nurse, Iris Bonilla, told Sopharie that Bruno wanted to see her and that she had to wait for Bruno in the nurse's office. Bonilla told Sopharie that Bruno had "second thought[s] of rehiring [Sopharie] for the next year." Sopharie testified that she remained in the nurse's office because she thought, "[I]f I dare to disobey I just have no opportunity to rehire, if I stay here I will be rehired." Bonilla told Sopharie that Bruno would come when the graduation ceremony was finished at 12:15 p.m.
When Sopharie wanted to leave the office to go buy something to eat, Bonilla said, "No, no, no, no, you wait, okay, then I will call Ms. Bruno and then she will come soon and then tell you whether you are rehired or not and then she will come and then you can go to eat." Sopharie asked if a student could get her something to eat, but Bonilla said, "[Y]ou seem not to understand *685 English and you are English teacher . . . I cannot understand how you could get certification if you do not know my language." Sopharie told Bonilla that she felt nauseous from not eating and from the cold room, but Bonilla told her to "just sit still." And so Sopharie remained because her experience at the school had taught her not to ask questions and "how to be obedient in [her] school." The nurse's assistant sat there watching Sopharie the entire time.
Bruno arrived at about 12:05 p.m. Sopharie said she "ran from [her] chair" to thank Bruno for reconsidering her case. Bruno told Sopharie that she had to wait for a final decision from the Central Office on whether or not Bruno could rehire her. Bruno asked Sopharie what was wrong with her, why she had no voice, and whether she wanted to talk. Sopharie testified that Bruno told her that "some people" said she had a "bad intention." Bruno testified that she had a duty to report what Ashworth related and admitted that she did not allow Sopharie to go home.
Sopharie was "shocked" and asked Bruno to speak to Karl. Sopharie called Karl and asked him to "describe . . . [her] character to [her] principal." Karl confirmed that he received this call. Sopharie told him that "she was being accused of wanting to kill 22 people in the school" and asked him to speak to Bruno. Karl observed that Sopharie sounded "as if she were under extreme stress." Bruno spoke to Karl and repeated the claim. Karl told Bruno that the claim "was preposterous," that Sopharie "was a Buddhist and would recoil from the idea of killing a cockroach," and urged her to investigate thoroughly. Bruno's only response was to repeat the accusations and the call ended. By that time a Board social worker named Denise arrived.[8] Sopharie heard Denise ask Bruno if she should "tie" Sopharie's hands, and Bruno replied, "no need, she is docile." Denise told Sopharie to "calm down" and Sopharie asked her to explain what was happening. Denise told Sopharie that Bruno said she would "attempt to kill 22 people" and that "people saw that you have [a] weapon inside your bag."
Sopharie "was so shocked" that she "stood up." She told Denise that it was "some kind of bad joke" and that she was a "very religious Buddhist" who could not imagine doing something like that. Denise repeatedly insisted that Sopharie "admit" that she wanted to kill twenty-two people. Denise turned to Bruno and asked if she should "use force" because Sopharie did not want to admit anything. Bruno was afraid Sopharie would "run" before "the force" arrived, but when Denise told Bruno that "the force is in front of the school," then Bruno agreed. Denise then used a walkie-talkie to radio the Jersey City Police Department Emergency Services Unit (Jersey City ESU) in front of PS 11, which immediately came to the nurse's office. Among them was Victor Cook, a police officer assigned to the Jersey City ESU. Cook testified that the Jersey City ESU had a rescue truck and could not do transports. Cook and his partner, Michael McCormack, responded to PS 11 at 12:47 p.m.
Sopharie repeatedly asked Bruno to tell her who said that she threatened to kill twenty-two people but Bruno said, "[Y]ou do not need to know the person." When the police asked about the source of the charge against Sopharie, she heard the Assistant Principal, Mrs. Diane Pistilli, tell them that Ashworth "ran to talk to Ms. Bruno saying that I have the gun and the bomb to kill 22 people." Sopharie heard the police ask Ashworth, "Sir, . . . did you *686 blow the horn to the principal that this young lady tried to kill people?" but Ashworth never responded. When the police questioned why Bruno believed Ashworth's claim against Sopharie, Bruno told the police that Ashworth had never lied to her and she would "take full responsibility" for Sopharie's removal.
Sopharie refused to speak with the police except to ask them to speak to Karl on the telephone, which they agreed to do. Karl testified that he received a second call one-half hour after the first call and Sopharie asked him to talk to a man she called "Officer." Karl identified himself to the man as Sopharie's "New York attorney." He heard the man say, "Miss Bruno . . . he's a New York attorney." Karl heard Bruno say, "Oh, no, don't listen to him" and the officer hung up. When the officer told Bruno that Karl said Sopharie was "innocent," Bruno told him to disregard Karl and "just remove her." Sopharie testified that the officers then "twisted" her hands behind her back. She saw the contents of her purse, including all her credit cards, strewn on the floor and, when she tried to retrieve them, the officers kicked her in her head and body for twelve minutes to prevent her from getting the items.[9] She was bleeding and developed seventy-two bruises. The police found no weapon in Sopharie's purse and never handcuffed her, but she said they "drag[ged]" her into the hallway "like [an] animal."[10] When Sopharie was being taken away through the hallway, there were fifty to seventy people watching and someone spit on her head.
Steven Nacim, an EMT, and his EMT partner, Lenin Portes, worked for the JCMC Emergency Unit. They received a 911 dispatch at 12:43 p.m. and arrived at PS 11 at 12:49 p.m. MCU, which does psychiatric evaluations, was already on the scene when Nacim and Portes arrived. Two police officers with the Jersey City ESU were also on the scene. Nacim said that Sopharie was "very uncooperative, irate," "very upset" and "moving around very frantic." Nacim did not see any sign of trauma. Nacim and Portes decided to take Sopharie to a hospital for evaluation. Cook and McCormack both testified that the Jersey City ESU had no input in this medical decision.
At Sopharie's request, she was taken in an ambulance at 1:03 p.m. by Nacim and Portes to Christ Hospital, rather than the JCMC, which was closer. Karl then got a third call from Sopharie who said that she was in an ambulance. She asked him to come to the hospital and speak to someone in the ambulance. Sopharie claimed that she was placed in a straight jacket, although Nacim denied having such equipment in the ambulance. Accompanied in the ambulance by a police officer from the Jersey City ESU, Sopharie was transported as a "priority two . . . urgent transport" with "[l]ights and sirens." They arrived at Christ Hospital at 1:08 p.m. Karl went to pick up Song and bring him to the hospital, but Song had already left his home to go there and so Karl went to the hospital to offer support to both plaintiffs.
Denise also went to the hospital and tried to get Sopharie to admit that she "tr[ied] to kill 22 people" and told her, "[I]f [she did] not say it peacefully . . . they [would] give [her] the medication that let [her answer] whatever they ask[ed her]." Denise continued to question Sopharie until the doctors told her not to ask any more questions because Sopharie's blood *687 pressure was so high that she could have a heart attack.
Sopharie was released from Christ Hospital at 6 p.m. that night with blood pressure medication. However, she was discharged against medical advice because her examining psychiatrist wanted her to consent to a twenty-four-hour observational admission. Her Axis I diagnosis was "generalized anxiety, rule out homicidal ideation." The next day she went to see her family physician and he took pictures of her contusions.
Sopharie had never had psychiatric or psychological treatment in the past and had never committed a crime or been accused of committing a crime. She had never committed an act of violence or been accused of doing so. Sopharie said that she filed this lawsuit because now her name is "dirty" and her students "run away from [her]" when they see "[her] around town" because "[e]veryone thinks [she is] a real dangerous person."
Ashworth was deposed and disputed Sopharie's version of the events occurring on June 24, although he had no recollection of much of the conversation that morning as described by her. He testified that he was not aware on June 24 that Sopharie would not be rehired. Ashworth admitted that none of his previous interactions with Sopharie would lead him to believe she was violent. He also admitted that he had no reason to believe she was armed.
Sopharie submitted a notarized statement from Lisa Mungin dated June 26, 2002, which states:
To Whom it may Concern:
Ms. Leang is not a violent person as I have known her this school year. She said that the amount of stress in her body was enough to have killed people. This is simply a way of her expression.
A second notarized statement from Ortiz says, in part:
To Whom It may concern,
. . . . I was completely shock [sic] to witness the malicious completely distorted set of circumstances and communication that occurred on 6-24-02 at 9.35 AM. Specifically, on 6-24-02, I heard Ms. Leang said [sic] that she was sick; she got laryngitis. She said that she took several courses at the NJCU that made her have a lot of stress. Her doctor said The [sic] amount of stress in her body could have killed some people. The evil distorted malicious interpretation which made of her innocent answer to his question was clear lies. Therefore, in my opinion these [sic] intentional act was done to discredit Ms. Leang. I was ashamed to see such behavior on the part of professional adults.
Bruno testified that she told Bonilla to call the MCU and stated that she did not call the police because there was no "alleged crime." Bruno further testified that the Board has a zero tolerance policy, "[n]o threats, no violence of any kind, no drugs." Bruno admitted that when she told Sopharie what Ashworth had said, "She denied it." Bruno testified that she told Sopharie that she had to report it. Bruno was unable to recall whether she spoke with Ortiz and Rivera before or after Sopharie was taken away, but both women told Bruno that they did not hear the remark. Bruno agreed that she had a "he said/she said situation." Bruno also testified that when the paramedics asked her what happened, she told them that Sopharie "made a threat to a teacher and that teacher wrote it down for me and [he] stands by what he heard."
On August 9, 2002, Sopharie wrote to Epps and "demand[ed] an explanation of [and] a full and thorough investigation" of the events of June 24, 2002. The three-and-a-half-page *688 single-spaced letter provides Sopharie's account of the incident. On August 26, 2002, Epps replied, "The information which I received about this incident leads me to believe that it was handled appropriately by school staff."
The Board produced a document entitled "A Uniform State Memorandum of Agreement Between Education and Law Enforcement Officials," 1999 Revisions (Uniform Memorandum), that was promulgated by the State Departments of Law & Public Safety and Education. The agreement had been signed by the Hudson County Prosecutor, the Chief of the Jersey City Police Department, the State District Superintendent, the Chairperson of the Board and the Hudson County Superintendent of Schools.
The nature of the problem identified in the agreement is contained in ¶ 1.2, which provides in pertinent part:
Recent events in New Jersey and throughout the nation have made clear that while schools are generally safe places for students and staff members, a wide range of offenses are occasionally committed on school property, during operating school hours, or during school-related functions and activities. These offenses against persons or property may involve the actual or threatened infliction of bodily injury [and] the unlawful use or possession of firearms or other dangerous weapons. . . . It is understood and agreed that the commissions of these types of offenses on school property, whether directed at students, school employees, or school property, not only undermines the educational environment, but can directly endanger the safety and well-being of members of the school community and thus requires an appropriate and decisive response.
This agreement in ¶ 4.6 requires school officials to immediately notify the Jersey City Police Department
whenever any school employee in the course of his or her employment develops reason to believe that a firearm has unlawfully been brought onto school property, or that any student or other person is in unlawful possession of a firearm, whether on or off school property, or that any student or other person has committed an offense with or while in possession of a firearm.
The agreement in ¶ 4.10 also requires school officials to immediately notify the Jersey City Police Department
whenever any school employee in the course of his or her employment develops reason to believe that a student has threatened, is planning, or otherwise intends to cause death, serious bodily injury, or significant bodily injury to another person under circumstances in which a reasonable person would believe that the student genuinely intends at some time in the future to commit the violent act or to carry out the threat.
The agreement as a whole deals primarily with the conduct of students.
The Board adopted Standard Operating Procedure (SOP) # 2.044, "Notification of Police/Potential and Actual Criminal Offenses" (SOP # 2.044), effective February 12, 2002. This SOP requires school administrative staff to notify the police whenever there is reason to believe that a firearm has been brought onto school property or a student has threatened or intends to commit an act of violence.

II
Plaintiffs' attorney did not appear for oral argument on the summary judgment motions. One defense attorney informed the court that plaintiffs' attorney's office *689 believed the motions had been heard on the papers on a different day. The judge granted both motions but entered no written order at that time. The judge stated, "There is no question but that both of the movants are entitled to summary judgment in this matter." She first observed that the facts advanced by the two sets of movants were deemed admitted because plaintiffs did not respond to each statement of fact in the manner required by R. 4:46-2(a). She held that the school defendants were entitled to a qualified immunity, which she held was an issue of law for the court, and that once the threat was made, they had a duty to report it. She concluded that there were no facts that would cause her to find that qualified immunity did not exist. She did not discuss any case law or statute that informed her decision.
The motion judge also concluded that if the medical defendants were state employees, they were entitled to a qualified immunity. She found that the medical defendants' actions were consistent with the statutes and rules that govern their behavior. As to the false imprisonment in the nurse's office, the judge determined that there was no evidence that Sopharie was restrained, despite Sopharie's sworn testimony that she was not permitted to leave and Bruno's testimony that she would not permit Sopharie to leave. She specifically rejected Sopharie's testimony that she was induced to stay by a false promise that her contract renewal was being reconsidered, finding that "there was no evidence that that was even an issue on that particular date." Again, the judge did not support her conclusions with any reference to case law or statute.
The motion judge also concluded that, in any event, plaintiffs had not proven any damages. She found that there was no medical evidence, no medical reports and no medical bills. She then turned to the claim against Ashworth:
As to the claim of sexual harassment against Ashworth, who is according to the evidence advanced admittedly gay, and who indicated in his depositions that he has absolutely no interest in her and never acted in any way to so suggest or to harass her.
There is no evidence that it [w]as ever reported, and no evidence that it was  other than to a co-teacher allegedly, and never reported to any supervisor.
The motion judge found that plaintiffs made no mention of Epps in their opposition to the summary judgment and that the claim of punitive damages was totally unsupported by any evidence advanced. She concluded as a matter of law that plaintiffs could not prosecute the wrongful discharge claim because Sopharie was a provisional teacher with no reasonable expectation of having the contract renewed. She also noted that "Ms. Leang was put on notice as early as December 200[1] that there was a problem with her performance." She concluded that the school defendants were all immune and entitled to a dismissal of the claims against them with prejudice. Once again, the judge did not support her ultimate conclusions with any citation to any legal authority.
The judge then turned her attention to the medical defendants. She reiterated her conclusion that they were entitled to a qualified immunity as state actors. She determined that there was no involuntary commitment, that Sopharie was taken to the emergency room, not the psychiatric unit, and that the medical defendants had probable cause to take her to the hospital. She noted that there was no medical evidence or records advanced to suggest that the medical defendants did not comply with applicable medical standards. The judge also concluded that there was no *690 evidence to support Sopharie's sworn testimony that she was beaten by the police officers who accompanied the medical defendant's employees. Thus, she dismissed the claims against the medical defendants with prejudice. There was no more legal support for any of these conclusions than there was for all the others.
On December 8, 2005, plaintiffs filed a notice of motion for reconsideration. The motion judge heard that motion on February 17, 2006. She found that plaintiffs had not met the standard for reconsideration under R. 4:49-2, that they had not shown that the judge erred, that in fact she had "rendered what I believe to have been a careful, thorough and correct decision on the merits of the case," and denied the motion for reconsideration. She reiterated that "employees have imploded, exploded and killed people so it was . . . proper and reasonable for this report to have been made that this teacher said what it was reported that she said." The judge entered written orders that granted summary judgment in favor of the school defendants and the medical defendants and dismissed the case against them.
On July 10, 2006, plaintiffs filed a notice of appeal, which they amended on July 18, 2006. They contend that their counter-statement of facts denied the facts asserted by the school and medical defendants and that summary judgment should be granted to them on the psychiatric arrest claims. They assert that the medical defendants acted in bad faith and improperly treated and transported Sopharie. They urge that defendants are not entitled to a qualified immunity and, even if they were, the entities must remain as defendants because of the claims of unconstitutional policies, practices and customs. They argue that the injury threshold is irrelevant and that defendants violated Sopharie's procedural and substantive due process rights and her liberty interests. They further claim that defendants falsely imprisoned Sopharie and defamed, slandered and injured Sopharie's business reputation. Plaintiffs also point out that the hostile work environment claim must go to a jury to determine whether PS 11 or the Board knew that Ashworth engaged in sexual harassment of female employees. Finally, they contend that they made out a prima facie claim of wrongful discharge and that punitive damages are appropriate on the facts of this case.

III.
Summary judgment is designed to provide a prompt, businesslike and inexpensive method of resolving cases. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74, 110 A.2d 24 (1954). In reviewing a ruling on a summary judgment motion, we apply the same standard as that governing the trial court. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998); Antheunisse v. Tiffany & Co., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989).
Plaintiffs assert that the motion judge erred when she found that the defendants' statement of facts should be deemed admitted because plaintiffs failed to submit a statement that admitted or denied each separate assertion of undisputed facts as required by R. 4:46-2(b). They argue that their counter-statement clearly was intended to comply with the requirement of the rule and created disputes as to the material facts.
Summary judgment is only appropriate if there is no genuine issue as to any material fact in the record:

*691 The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.
[R. 4:46-2(c).]
Brill outlined the standard for deciding a summary judgment motion:
[A] determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
[Brill, supra, 142 N.J. at 540, 666 A.2d 146 (emphasis added).]
Therefore, the motion must be considered on the basis that the nonmoving parties' assertions of fact are true and the court must "grant all the favorable inferences to the non-movant." Id. at 536, 666 A.2d 146. The determination is whether the evidence "`is so one-sided that one party must prevail as a matter of law'" Ibid. (quoting Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)).
"If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a `genuine' issue of material fact for purposes of Rule 4:46-2." Id. at 540, 666 A.2d 146. "However, an opposing party who offers no substantial or material facts in opposition to the motion cannot complain if the court takes as true the uncontradicted facts in the movant's papers." Baran v. Clouse Trucking, 225 N.J.Super. 230, 234, 542 A.2d 34 (App.Div.), certif. denied, 113 N.J. 353, 550 A.2d 463 (1988).
When the motion judge deemed the statement of undisputed facts as admitted, she erred in two respects. First, the plain language of R. 4:46-2(b) does not permit a judge to simply assume that each of the facts alleged in a statement of undisputed facts is true without examining the record. Rather, the rule only permits the judge to assume the facts are admitted if "all material facts in the movant's statement . . . are sufficiently supported." R. 4:46-2(b) (emphasis added). In this respect we note that, although the rule is stated in mandatory terms, where the motion is opposed and admissible evidence in the opposition raises a genuine dispute of a material fact, the motion judge should order compliance with the requirements of R. 4:46-2(b), failing which a monetary sanction may be imposed, "particularly where the record on the motion requiring judicial analysis is voluminous." Pressler, Current N.J. Court Rules, comment 1.2 on R. 4:46-2 (2007) (emphasis added) (citing Lyons v. Twp. of Wayne, 185 N.J. 426, 436, 888 A.2d 426 (2005), and Mandel v. UBS/PaineWebber, Inc., 373 N.J.Super. 55, 81-83, 860 A.2d 945 (App.Div.2004), certif. denied, 183 N.J. 213, 871 A.2d 91 (2006)).
The Lyons Court specifically observed, "We expect that parties will comply with the appropriate summary judgment requirements in the future, and, if not, trial courts will consider the imposition of sanctions." Lyons, supra, 185 N.J. at 436, 888 A.2d 426 (emphasis added). And in Mandel we said
The requirements of R. 4:46-2(a) and (b) for filing statements of material facts by parties to a motion for summary judgment are designed to "focus . . . *692 attention on the areas of actual dispute" and "facilitate the court's review" of the motion. Pressler, Current N.J. Court Rules, comment R. 4:46-2. Indeed, we noted in Housel v. Theodoridis, 314 N.J.Super. 597, 604, 715 A.2d 1025 (App. Div.1998), that those requirements are "critical" and "entail[] a relatively undemanding burden."
[Mandel, supra, 373 N.J.Super. at 82, 860 A.2d 945.]
The motion judge here ought to have required compliance with R. 4:46-2(b) and, if it was not forthcoming, she could have imposed a sanction. Instead, she erred in assuming that the statements of facts submitted by defendants were admitted.
Second, the school defendants' statement of allegedly undisputed facts contained numerous statements that clearly were disputed by the entire record before the motion judge and were even disputed in the documents the school defendants themselves submitted in support of their motion. For example, the school defendants included Ashworth's version of what Sopharie said about stress and killing people, but attached the portions of Sopharie's deposition in which she testified that she actually told Ashworth: "[M]y doctor said the . . . amount of stress in my body could have killed some people." Thus, the evidence attached to the school defendants' statement of "undisputed facts" raised a fact dispute on the central premise of plaintiff's action: that she never made the statement of which she was accused. In addition, the motion judge blindly accepted Ashworth's testimony that he was gay and would never sexually harass a female and disregarded Sopharie's sworn testimony that he did so repeatedly and that she complained about it to Karl and three of her co-workers.
Moreover, the analytical framework employed by the judge was directly contrary to the standard for judicial analysis of a summary judgment motion set forth in Brill. The Brill standard requires a judge "to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, 142 N.J. at 540, 666 A.2d 146; see also Kelly v. County of Monmouth, 380 N.J.Super. 552, 557, 883 A.2d 411 (App.Div.2005). A judge may not merely accept as true all the allegations of a party's statement with no consideration of "the competent evidential materials." Brill, supra, 142 N.J. at 540, 666 A.2d 146.
The Brill Court cautioned that the function of a judge reviewing a summary judgment motion "is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Ibid. (quotation omitted). The analysis will employ "a kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials," but it does not permit a judge to engage in "the same kind of weighing that a factfinder (judge or jury) engages in when assessing the preponderance or credibility of evidence." Id. at 536, 666 A.2d 146. Most importantly, "[c]redibility determinations" are "to be made by a jury and not the judge." Id. at 540, 666 A.2d 146.
It is readily apparent here that the motion judge failed to follow the Brill mandate when she viewed the facts in a light most favorable to the school and medical defendants. Id. at 536, 666 A.2d 146. Additionally, rather than drawing all inferences favorably to plaintiffs, she actually discredited Sopharie's sworn testimony because she did not have any corroborating evidence. This error resulted in the judge accepting Ashworth's testimony of what *693 Sopharie said in the classroom as well as his claim that he could not have harassed Sopharie because he was homosexual. This error has a significant impact on the substantive issues decided by the motion judge.

IV.
Sopharie contends that the motion judge erred in dismissing her claim under 42 U.S.C.A. § 1983 that she was deprived of her substantive and procedural due process rights under the Fourteenth Amendment of the United States Constitution, which provides in pertinent part that "No State. . . . shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, ¶ 1. She also asserts that she was deprived of her First Amendment right to free speech and her privacy right to be left alone. The Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3, does not provide immunity from federal claims under § 1983. Tice v. Cramer, 133 N.J. 347, 375, 627 A.2d 1090 (1993) ("We emphasize only that whatever the immunity conferred by the [TCA], public entities and law enforcement personnel should understand that federal liability under section 1983 may exist, even if inconsistent with the [TCA], and if it does, the [TCA] provides no immunity from the federal claim.").
Federal rights for violations of federal law were created by 42 U.S.C.A. § 1983, which provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
That right of action, however, is subject to a federal qualified immunity, which is determined by a two-part inquiry. First, taken in the light most favorable to the party asserting the claim, the facts alleged must show that the public employee's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 282 (2001). Second, the constitutional right must be clearly established so that "it would be clear to a reasonable [person] that his conduct was unlawful in the situation he confronted." Ibid.
A "[q]ualified immunity `is an immunity from suit rather than a mere defense to liability' that is effectively lost if the case is allowed to go to trial." Wildoner v. Borough of Ramsey, 162 N.J. 375, 387, 744 A.2d 1146 (2000) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411, 425 (1985)). Thus, "a defendant's entitlement to qualified immunity is a question of law to be decided [as] early in the proceedings as possible, preferably on a properly supported motion for summary judgment or dismissal." Ibid. Good faith conduct is entitled to immunity. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Kirk v. City of Newark, 109 N.J. 173, 179, 185, 536 A.2d 229 (1988).
The "good faith" standard encompassed in N.J.S.A. 59:3-3 is one of "objectively reasonable conduct." Lascurain v. City of Newark, 349 N.J.Super. 251, 287, 793 A.2d 731 (App.Div.2002); see also Hayes v. Mercer County, 217 N.J.Super. 614, 622, 526 A.2d 737 (App.Div.), certif. denied, 108 N.J. 643, 532 A.2d 226 (1987). Generally, the question of whether *694 a public employee acted in good faith is a fact issue to be decided at a plenary hearing. Canico v. Hurtado, 144 N.J. 361, 365, 676 A.2d 1083 (1996). Summary judgment under the good faith immunity standard of N.J.S.A. 59:3-3 should be granted only "if public employees can establish that their acts were objectively reasonable or that they performed them with subjective good faith." Ibid. Thus, defendants bear the burden of proof.
Plaintiffs' federal constitutional claims against Ashworth, Bruno and Epps are based on the illegal detention and transport of Sopharie to a hospital against her will. There is no factual support for such a claim against Epps as he was not involved in the events of June 24, 2002, in any fashion. Plaintiff's only evidence with respect to Epps's conduct was his August 26, 2002, response to her August 6, 2002, letter. No fact-finder could conclude that Epps's reliance on the reports of the incident was evidence of actual malice or willful misconduct, or was objectively unreasonable. Indeed, it was correct to dismiss not only the constitutional claims but the entire action against him. We affirm the dismissal of all claims against Epps.
With respect to Ashworth and Bruno, we conclude that the first prong of Saucier is satisfied at the very least by a deprivation of liberty without due process because such a right is clearly established.[11]Dible v. Scholl, 506 F.3d 1106, 1110-11 (8th Cir.2007); Ye v. United States, 484 F.3d 634, 638 (3d Cir.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 905, 169 L.Ed.2d 729 (2008). And a reasonable person who is not a law enforcement officer and who has no other legal authority to arrest and detain would know that arresting and detaining another person is unlawful, satisfying the second prong of Saucier. Having viewed the facts in a light most favorable to plaintiffs, those facts establish that Bruno's conduct violated the constitutional right to liberty as Bruno's detention of Sopharie in the nurse's office for several hours and her decision to demand that the medical defendants transport Sopharie to a hospital were effected without any process at all. We are further satisfied that Ashworth may also be found liable under § 1983 because he was present at the nurse's office while the detention and transport were occurring and failed to retract his allegedly false statement.[12]
We also do not find that Ashworth is entitled to good-faith immunity under the facts presented by plaintiffs because Ashworth was acting in bad faith when he allegedly attributed false statements to Sopharie. Bruno, too, is not entitled to good-faith immunity as a matter of law because the facts are in dispute. Bruno admitted that she did not believe that any crime had been committed, which is also evidenced by her decision not to call the police, as required by the Uniform Memorandum and SOP # 2.044, but to request medical assistance. She also knew that Sopharie denied making the statement attributed to her by Ashworth, and knew, before Sopharie was transported, *695 that Ortiz and Rivera were present when Sopharie made the alleged statement. Bruno should have verified the accuracy of Ashworth's written statement with them. To summarize, Epps has no liability for the illegal detention and transport of Sopharie and Ashworth and Bruno have no good-faith immunity from plaintiffs' constitutional claims under § 1983.
The Board has no respondeat superior liability for its employees' violations of federal laws because it is well established that "a local government may not be sued under a § 1983 claim for an injury inflicted solely by its employees or agents." Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611, 638 (1978). As a consequence, we affirm the dismissal of the federal claims against the Board predicated on respondeat superior liability, but on other grounds than those expressed by the motion judge.
The Board is only subject to claims under § 1983 if official policies are alleged to have caused the injury that forms the basis of the complaint. Ibid.
[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.
[Ibid.]
The only documents in the record that could be considered to be a policy are the Uniform Agreement and SOP # 2.044, which Bruno cited to justify her conduct. Neither document purports to apply to teachers, staff and school administrators. The portions of these documents that appear relevant to Bruno's claimed justification do not violate the due process clause of the Fourteenth Amendment because they apply to students, who do not enjoy the full panoply of federal civil rights enjoyed by adults in our society. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Prince v. Massachusetts, 321 U.S. 158, 168-69, 64 S.Ct. 438, 443, 88 L.Ed. 645, 653-54 (1944). These documents, in any event, both require that school administrators call the police, not the MCU. Thus, they hardly provide support to Bruno's decision to allege that there was a "violent emotionally disturbed person" at PS 11. The evidence of some amorphous "Zero Tolerance Policy" is too thin to support a reversal of the dismissal of the Board under § 1983 and the order dismissing the federal claims as to the Board is affirmed.

V.
Plaintiffs assert that the motion judge also erred in dismissing their negligence and intentional-tort claims. The tort liabilities and immunities of public entities and their employees are governed by the TCA. It is "the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein." N.J.S.A. 59:1-2. Only tort-based claims are subject to the immunities provided by the TCA. Pinkowski v. Twp. of Montclair, 299 N.J.Super. 557, 568, 691 A.2d 837 (App.Div.1997) ("The immunity provided governmental entities under the Act is limited to tort based liability." (citation omitted)).
The TCA defines "public entity" as "includ[ing] the State, and any county, municipality, district, public authority, public agency and any other political subdivision or public body in the State." N.J.S.A. 59:1-3. The medical defendants *696 are clearly not public entities[13] and do not enjoy the immunities of the TCA. A "public employee" is "an employee of a public entity." Ibid. The tort claims advanced by plaintiffs against the school defendants are (1) false imprisonment, (2) battery, (3) assault, (4) defamation, slander and libel, (5) intentional infliction of emotional distress and (6) Song's per quod claim.
The TCA reestablished the common law immunities of public entities and their employees. N.J.S.A. 59:2-1(a) ("Except as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."). Furthermore, "[a]ny liability of a public entity established by this act is subject to any immunity of the public entity." N.J.S.A. 59:2-1(b). "Immunity is the dominant consideration of the [TCA]. Thus, when both liability and immunity appear to exist, immunity prevails." Blunt v. Klapproth, 309 N.J.Super. 493, 507, 707 A.2d 1021 (App. Div.) (citations omitted), certif. denied, 156 N.J. 387, 718 A.2d 1216 (1998).
The TCA provides that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual." N.J.S.A. 59:2-2(a). However, where the public employee is not liable the public entity is not liable. N.J.S.A. 59:2-2(b). Respondeat superior liability is the primary liability imposed by the TCA. Tice, supra, 133 N.J. at 355, 627 A.2d 1090.
The public-entity immunities provided by the TCA are found in N.J.S.A. 59:2-1.1,-1.2 and 2-3 to-11. The school defendants do not rely on any of these public-entity immunities. Rather, they rely on public-employee immunities. Generally, "a public employee is liable for injury caused by his act or omission to the same extent as a private person." N.J.S.A. 59:3-1. However, "[t]he liability of a public employee established by this act is subject to any immunity of a public employee provided by law." N.J.S.A. 59:3-1(b). As a result, immunities are the exception with respect to a public employee. Fluehr v. City of Cape May, 159 N.J. 532, 539, 732 A.2d 1035 (1999) ("Generally, immunity for public entities is the rule and liability is the exception. In contrast, immunity of a public employee under the TCA is the exception." (citations omitted)).
The school defendants contend that they are immune from suit based on N.J.S.A. 59:3-3, which provides: "A public employee is not liable if he acts in good faith in the execution or enforcement of any law." Initially, we note that this immunity clearly does not apply to plaintiffs' claim of false imprisonment because the statute goes on to provide: "Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." N.J.S.A. 59:3-3; see also O'Brien v. Borough of Woodbury Heights, 679 F.Supp. 429, 438-39 (D.N.J. 1988). "A public official may be held liable for false imprisonment where he has acted outside his authority." Lakutis v. Greenwood, 9 N.J. 101, 106, 87 A.2d 23 (1952). False imprisonment is the "unlawful restraint upon a man's freedom of locomotion." Earl v. Winne, 14 N.J. 119, 128, 101 A.2d 535 (1953).
Nevertheless, with respect to all six tort claims, the school defendants have not suggested what law they were executing *697 or enforcing that would trigger good-faith immunity under N.J.S.A. 59:3-3 and we know of none. The conduct that underlies the claim of false imprisonment in this case bears little resemblance to the act of a police officer carrying out his duties, however imperfectly. Surely, the making of a false report to the City defendants is not executing or enforcing any law and neither is detaining a teacher in the nurse's office for three hours and then demanding that the City defendants and medical defendants remove her from the school involuntarily for transport to a hospital.
The motion judge did not address this issue, instead assuming that all tortious acts were shielded from liability if the school defendants acted in good faith. There is neither statutory nor case law support for such a proposition. If a plaintiff does not complain about a defendant's enforcement of a law per se, "[t]he immunity for enforcing and executing the law does not protect defendants" from a claim of negligence based on the breach of some other duty. Del Tufo v. Twp. of Old Bridge, 278 N.J.Super. 312, 326, 650 A.2d 1044 (App.Div.1995), aff'd, 147 N.J. 90, 685 A.2d 1267 (1996).
We have specifically held that a good-faith immunity defense is not available to a public employee when the plaintiffs claim defamation, slander and libel because:
actual malice, as defined by New York Times v. Sullivan,[[14]] as an utterance made with knowledge of its falsity or with reckless disregard of whether it was false or not, was not only an element of plaintiffs' substantive causes of action as to which they had demonstrated a prima facie case but was also dispositive of the qualified immunity issue. That analysis comports with Burke v. Deiner, 97 N.J. 465, 475-477, 479 A.2d 393 (1984), in which the Supreme Court made clear that in a defamation case the qualified privilege of a non-constitutional public officer is lost by actual malice as defined by New York Times. Simply put, good faith as a condition of the qualified immunity afforded by N.J.S.A. 59:3-3 and actual malice in the New York Times sense are mutually exclusive.
[Jobes v. Evangelista, 369 N.J.Super. 384, 395, 849 A.2d 186 (App.Div.), certif. denied, 180 N.J. 457, 852 A.2d 193 (2004).]
The remaining claims against the school defendants that are subject to the TCA, false imprisonment, battery, assault, intentional infliction of emotional distress and the per quod claim, are all intentional torts, i.e., willful misconduct or based on intentional torts. See, e.g., Kelly v. County of Monmouth, 380 N.J.Super. 552, 558, 883 A.2d 411 (App.Div.2005) (discussing willful misconduct in the context of an intentional battery). There is nothing in the record to suggest that the motion judge even considered N.J.S.A. 59:3-14, which provides that "[n]othing in this act shall exonerate a public employee from liability if it is established that his conduct . . . constituted . . . actual malice or willful misconduct." Our Supreme Court has addressed this bar to immunity based on willful misconduct:
[W]e analyzed the difference between willful misconduct and negligence [in] Foldi v. Jeffries, 93 N.J. 533, 461 A.2d 1145 (1983). "The standard is . . . [an] intermediary position between simple negligence and the intentional infliction *698 of harm." Id. at 549, 461 A.2d 1145. Although it is clear that willful misconduct is something more than mere negligence, "[t]here is no simple formula which will describe with exactness the difference between negligence and willful and wanton misconduct. The concept of misconduct ranges in a number of gradations from slight inadvertence to malicious purpose to inflict injury." McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305, 266 A.2d 284 (1970).
[Fielder v. Stonack, 141 N.J. 101, 123-24, 661 A.2d 231 (1995).]
We also discussed N.J.S.A. 59:3-14 in Taglieri v. Moss, 367 N.J.Super. 184, 842 A.2d 280 (App.Div.2004). There, a physician working at the University of Medicine and Dentistry of New Jersey, a state entity, was charged with willful misconduct in writing excessive prescriptions for narcotics. We concluded that "[t]he plain language of N.J.S.A. 59:3-14 is beyond dispute." Id. at 196, 842 A.2d 280. We found no indication in the TCA or the intent of the Legislature that any meaning was intended that was inconsistent with the plain language of the provision. Ibid. Indeed, we noted that "the 1972 Task Force Comment to N.J.S.A. 59:3-14" stated: "`It is the intent of this provision that a public employee guilty of outrageous conduct cannot avail himself of the limitations as to liability and damages contained in this act.'" Ibid. As a consequence, N.J.S.A. 59:3-14 trumps the immunity provisions of N.J.S.A. 59:3-3. Therefore, the claims against Ashworth and Bruno for false arrest, assault, battery, false-light invasion of privacy and intentional infliction of emotional distress should not have been dismissed under the good faith immunity of N.J.S.A. 59:3-3.
The Board has no liability for the willful misconduct of its employees "because N.J.S.A. 59:2-10 immunizes public entities from suits based upon the willful acts and omissions of their employees." Kelly, supra, 380 N.J.Super. at 558, 883 A.2d 411. Therefore, these intentional-tort claims against Ashworth and Bruno should not have been dismissed under the good-faith immunity of N.J.S.A. 59:3-3. The error in dismissing the Board under this same immunity is harmless, because plaintiffs are barred from making a respondeat superior claim against the Board for any of these intentional torts by virtue of N.J.S.A. 59:2-10. Seal Tite Corp. v. Bressi, 312 N.J.Super. 532, 539, 712 A.2d 262 (App.Div.), certif. denied, 156 N.J. 411, 719 A.2d 643 (1998).
We turn to the issue of recoverable damages for false imprisonment, assault, battery, defamation, slander, libel, intentional infliction of emotional distress and the per quod claims. The motion judge dismissed these claims against the school defendants under the provisions of N.J.S.A. 59:9-2(d):
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.
We cannot address this issue without first discussing DelaCruz v. Borough of Hillsdale, 183 N.J. 149, 870 A.2d 259 (2005). There the Court addressed two questions, one of which is pertinent to any discussion of the injury threshold of N.J.S.A. 59:9-2(d): "does the [injury] threshold of the [TCA] N.J.S.A. 59:9-2(d) apply to common law false arrest/false imprisonment claims against police officers[?]" Id. at 153, 870 A.2d 259. The Court held that the N.J.S.A. 59:3-3 bar to *699 good-faith immunity for false imprisonment does not preclude the application of N.J.S.A. 59:9-2(d) to claims for pain and suffering proximately caused by false arrest or imprisonment because the bar to good-faith immunity in N.J.S.A. 59:3-3 applied only "in this section." Id. at 162-63, 870 A.2d 259; see also Marion v. Borough of Manasquan, 231 N.J.Super. 320, 331-32, 555 A.2d 699 (App.Div.1989). The Court concluded:
Nothing in the Act exempts false arrest/false imprisonment claims from the reach of the [injury] threshold requirement of N.J.S.A. 59:9-2(d). . . . Finally, the need to vault the [injury] threshold is not limited to false arrest or false imprisonment claims; the Act makes no such distinctions and, instead, treats all torts similarly. The clear terms of the Tort Claims Act require that all claims-including those for false arrest and false imprisonment-must vault the [injury] threshold in order to be cognizable.
[DelaCruz, supra, 183 N.J. at 164-65, 870 A.2d 259.]
The motion judge erred in relying on N.J.S.A. 59:9-2(d) to justify dismissal of all of plaintiffs' intentional-tort claims because when N.J.S.A. 59:3-14 applies, all limitations on recoverable damages are lost by the plain language of the TCA.
We have previously foreclosed the N.J.S.A. 59:9-2(d) injury threshold as a defense to intentional-tort damages. In Taglieri the doctor claimed the protection of the injury threshold, which the plaintiff contended was inapplicable based on the doctor's "willful misconduct." 367 N.J.Super. at 194-95, 842 A.2d 280. We concluded that the plain language of N.J.S.A. 59:3-14 resolved the issue of the application of the injury threshold to public employee conduct within the scope of the statutory provision. Id. at 194, 842 A.2d 280. Subsection (a) provides that "[n]othing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3-14(a) (emphasis added). Subsection (b) provides that "[n]othing in this act shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3-14(b) (emphasis added). We compared the language of these provisions to N.J.S.A. 59:3-3, which merely provides that "[n]othing in this section exonerates a public employee from liability for false arrest or false imprisonment." Taglieri, supra, 367 N.J.Super. at 196 n. 16, 842 A.2d 280. We also observed that the injury threshold was not a bar to suit entirely, but only a limitation on recoverable damages. Id. at 197, 842 A.2d 280. The DelaCruz Court also observed that "the effect of the [injury] threshold is limited to pain and suffering claims, economic or consequential damages are not limited by the [TCA]." 183 N.J. at 164, 870 A.2d 259.
In Jobes the plaintiffs sought compensatory and punitive damages against Evangelista, the Pompton Lakes Fire Chief, the Pompton Lakes Volunteer Fire Department and the Borough of Pompton Lakes on claims of defamation, malicious prosecution and false-light invasion of privacy. Jobes, supra, 369 N.J.Super. at 390, 849 A.2d 186. Contrary to the results of investigative reports from the Police and Fire Departments that indicated the plaintiffs bore no responsibility in connection with a fire at their place of employment, Evangelista asked a police detective to prepare criminal complaints against the plaintiffs, which Evangelista signed, charging them *700 with fourth-degree crimes based on failure to report or control a fire. Id. at 392-93, 849 A.2d 186. We affirmed the trial court's decision that the injury threshold limitations of N.J.S.A. 59:9-2(d) did not apply to the causes of action asserted against Evangelista because the jury was required to find actual malice in order to impose liability. Id. at 400, 849 A.2d 186. This conclusion was based on the plain language of N.J.S.A. 59:3-14(b) providing that nothing in the TCA limited recoverable damages for the conduct encompassed in the scope of that provision.
We decided Kelly v. County of Monmouth after the DelaCruz decision. 380 N.J.Super. 552, 562-66, 883 A.2d 411 (App. Div.2005). We considered whether the broad language in DelaCruz required the dismissal of claims against a public employee based on the injury threshold. The plaintiff was a Monmouth County building and grounds employee who alleged that the supervisor of the County's reclamation center had "grabbed at" his genitals when greeting the plaintiff upon his arrival at the center. Id. at 556-57, 883 A.2d 411. The supervisor denied that he had grabbed the plaintiff's genitals and characterized the encounter as consensual "horseplay." Id. at 557-58, 883 A.2d 411.
The defendants then raised the defense of the injury threshold. Id. at 561-62, 883 A.2d 411. Because Taglieri and Jobes had resolved that issue before DelaCruz, we considered whether DelaCruz compelled a different result.
[T]he Supreme Court held that "[t]he clear terms of the Tort Claims Act require that all claimsincluding those for false arrest and false imprisonmentmust vault the verbal threshold in order to be cognizable." 183 N.J. at 164-65, 870 A.2d 259 (emphasis added). However, despite the expansive tone of this holding, indicating there are types of tort claims other than false arrest and false imprisonment claims to which the verbal threshold will apply, we find the present circumstances are distinguishable and warrant a different result because the police officers in DelaCruz were arguably acting under color of law, and thus arguably within the scope of employment, when they falsely arrested and imprisoned the plaintiff. Accordingly, we find nothing in the Court's holding in DelaCruz that would suggest the [injury] threshold would also apply to tort claims asserted against a public employee when the public employee not only acts willfully, or within the terms of N.J.S.A. 59:3-14(b), but also, unlike DelaCruz, outside the scope of employment.
[Id. at 563, 883 A.2d 411.]
We also observed, "as we held in Jobes and Taglieri, that the Legislature intended to preclude the application of the injury threshold to claims against public employees that are based upon willful misconduct, or conduct outside the scope of employment." Ibid. We "discern[ed] no societal interest that would be promoted by insulating a person from the full consequences of intentional torts arising from conduct beyond the scope of employment." Ibid.
We conclude that the motion judge here erred in dismissing the intentional tort claimsfalse imprisonment, assault, battery, defamation, slander, libel, intentional infliction of emotional distress and the per quod claimagainst Ashworth and Bruno under the injury threshold of N.J.S.A. 59:9-2(d). We have already held that the Board has no liability for any of these claims.

VI.
Waiver of immunity and the contractual liability of public entities are governed *701 by the New Jersey Contractual Liability Act (CLA). N.J.S.A. 59:13-1 to-10. Sopharie's contract claims against the school defendants are governed by the CLA. Such claims may only be made against the party to the contract, here the Board, and not Board employees. Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 309, 788 A.2d 268 (2002). As a consequence, any such claims against Ashworth and Bruno were properly dismissed, albeit for the wrong reason.
With respect to the Board, the waiver of immunity is limited to express contracts or implied-in-fact contracts. N.J.S.A. 59:13-3. This waiver must be strictly construed. Allen v. Fauver, 167 N.J. 69, 75, 768 A.2d 1055 (2001); 75 Spruce St., L.L.C. v. N.J. State Bd. of Educ., 382 N.J.Super. 567, 581, 889 A.2d 1144 (Law Div.2005). We do not know from the record before us whether there was a written contract, but certainly there was an implied-in-fact contract because Sopharie worked for the Board for almost a year and was paid for her services. Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 144 N.J. 564, 575, 677 A.2d 747 (1996). As a consequence, Sopharie is not barred by sovereign immunity from suing the Board for breach of contract.
The motion judge dismissed the contract claims because Sopharie had no expectation of employment beyond the end of the 2001-02 school year. She did not address the breach-of-contract claim in her decision on the record with reference to breaches occurring before the end of the school year, if any. Certainly, Sopharie has presented facts from which a reasonable finder of fact might conclude that the Board's mentor program was part of Sopharie's contract because that program was clearly intended to help provisional teachers to succeed and secure tenured appointments. Woolley v. Hoffmann-La Roche, 99 N.J. 284, 302, 491 A.2d 1257, modified, 101 N.J. 10, 499 A.2d 515 (1985); Gilbert v. Durand Glass Mfg. Co., Inc., 258 N.J.Super. 320, 330, 609 A.2d 517 (App. Div.1992). It is correct to say that she had no protectable expectation of employment beyond one year as a provisional teacher. Union County Bd. of Educ. v. Union County Teachers Ass'n, 145 N.J.Super. 435, 437, 368 A.2d 364 (App.Div.1976). That rule of law, however, is not dispositive of Sopharie's breach-of-contract claim for the period of time ending with the termination of her contract. The record before us does not reveal whether Sopharie has any economic damages from the failure to provide a mentor program. Nor do we know from the record whether Bruno's conduct in ignoring Sopharie's repeated requests for the ESL curriculum, which Bruno admitted would result in increasingly unsatisfactory evaluations, caused economic loss to Sopharie. As a consequence, we reverse the dismissal of the breach-of-contract claim against the Board. Of course, if Sopharie suffered no economic loss, summary judgment may be granted on that ground.
Sopharie also argues that she established a prima face case of "wrongful termination" based on her status as a woman over forty who is of Asian descent. She contends that the record shows that she was discriminated against because she was in a protected class, was performing her job at a level that met her employer's legitimate expectations and was discharged and replaced by another. In the first instance, these allegations do not fall within the scope of a cause of action for wrongful discharge. That cause of action was established by our Supreme Court in 1980:
We hold that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate *702 of public policy. The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. . . . An employee who is wrongfully discharged may maintain a cause of action in contract or tort or both. An action in contract may be predicated on the breach of an implied provision that an employer will not discharge an employee for refusing to perform an act that violates a clear mandate of public policy.
An action in tort may be based on the duty of an employer not to discharge an employee who refused to perform an act that is a violation of a clear mandate of public policy. In a tort action, a court can award punitive damages to deter improper conduct in an appropriate case. That remedy is not available under the law of contracts.
[Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72-73, 417 A.2d 505 (1980) (citations omitted).]
Whether proceeding in tort or contract, plaintiffs have not alleged that Sopharie "refused to perform an act that is a violation of a clear mandate of public policy." Id. at 72, 417 A.2d 505. Absent that key element, a wrongful discharge claim cannot be maintained. Although the motion judge dismissed this claim for the wrong reason, we affirm the dismissal based on the absence of this key element of the cause of action. In any event, Sopharie's wrongful discharge claim, in actuality, is a claim of unlawful discrimination based on age and race and will be discussed in that context.

VII.
[At the direction of the court pursuant to R. 1:36-3, the discussion of the other issues in the appeal has been omitted from the published version of the opinion.]

VIII.
Having resolved the issues raised with respect to the school defendants, we now address the claims against the medical defendants. The motion judge found that the medical defendants enjoyed a qualified immunity and that their conduct was consistent with unspecified statutes and rules that govern their behavior. As a result, she dismissed the claims against them.
Plaintiffs argue that the motion judge erred when she granted summary judgment to the medical defendants on the basis of qualified immunity because immunity for EMS workers is "not absolute." Plaintiffs also assert that the EMS workers admitted they had a policy of not using approved forms for screening for involuntary commitment and were not qualified to conduct screenings for involuntary commitment. She asserts that she did not consent to being taken to a hospital or receiving treatment of any kind, although she did express a preference to be taken to Christ Hospital, to which Nacim and Portes, as employees of the Medical Center, agreed.
There is no factual basis in the record to support any of plaintiffs' claims against the MCU. Nacim's deposition presented the sole evidence of the involvement of any specific medical personnel. But he testified that the MCU was already on the scene when he arrived. He also testified that he worked for the JCMC in the Emergency Unit, not the MCU, which was the unit that could perform clinical screenings. There is no evidence in the record establishing that the MCU performed a clinical screening and concluded that Sopharie was a danger to herself or others and required a psychiatric evaluation. Nacim admitted that he was not qualified to perform a clinical screening. Yet nonetheless, *703 he and Portes decided[15] to take Sopharie to a hospital for evaluation. Therefore, we conclude that the MCU was entitled to summary judgment.
The JCMC asserts that there are two statutory immunities granted to it, N.J.S.A. 2A:62A-1 and N.J.S.A. 30:4-27.7. N.J.S.A. 2A:62A-1 provides:
Any individual, including a person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, . . . who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof, or while transporting the victim or victims thereof to a hospital or other facility where treatment or care is to be rendered, shall not be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care.
The JCMC argues that this immunity applies because all it did was respond to a 911 call to render emergency care and attempt to assess and evaluate Sopharie. It contends that due to Sopharie's "uncooperative nature," its Emergency Unit could not assess and evaluate her. It asserts that Sopharie walked to the ambulance, got onto the stretcher by herself and asked to be taken to Christ Hospital, after which the Emergency Unit had no involvement with Sopharie.
The inherent flaw in this argument is that the facts are disputed. According to Sopharie, she refused treatment, she was forced to leave the school and was forced to get into the ambulance to be taken for a medical examination to which she did not consent. As to the N.J.S.A. 2A:62A-1 immunity itself, it applies only to the victims of accidents and emergencies. Certainly, there was no accident on June 24, 2002, and, without a clinical screening determination that Sopharie was a danger to herself or others, it certainly seems that there was no emergency. In such a case, the immunity afforded by N.J.S.A. 2A:62A-1 is not available.
With respect to N.J.S.A. 30:4-27.7, the JCMC argues that it is the employer of the JCMC Emergency Unit personnel, who qualify as "emergency services or medical transport person[s]" and thus the JCMC comes within the act's immunities. The statute provides:
An emergency services or medical transport person or their respective employers, acting in good faith pursuant to this act and pursuant to the direction of a person designated in subsection a. of this section, who takes reasonable steps to take custody of, detain or transport an individual for the purpose of mental health assessment or treatment is immune from civil and criminal liability.
[N.J.S.A. 30:4-27.7(b).]
Nacim and Portes were assigned to the JCMC's Emergency Unit, which performed medical transport services and, thus, subsection (b) potentially applies to them. The issue then becomes whether they were (1) "acting in good faith" (2) "pursuant to this act" and (3) "pursuant to the direction of a person designated in subsection a. of this section." Ibid. (emphasis added). Subsection a. of N.J.S.A. 30:4-27.7 provides:
A law enforcement officer, screening service or short-term care facility designated staff person or their respective employers, acting in good faith pursuant to this act [N.J.S.A. 30:4-27.1 to-27.11] who takes reasonable steps to assess, *704 take custody of, detain or transport an individual for the purposes of mental health assessment or treatment is immune from civil and criminal liability.
[N.J.S.A. 30:4-27.7(a).]
Assuming arguendo that Nacim and Portes were acting in good faith, the record before us does not establish, as a matter of undisputed fact, that they were acting "pursuant to this act" and "pursuant to the direction of a person designated in subsection a." Ibid. This is so in part because the record does not establish that a law enforcement officer or a screening service instructed Nacim and Portes to take Sopharie to a hospital for the purpose of a mental health assessment or mental health treatment. Indeed, the Jersey City ESU employees, Cook and McCormack, testified that they do not make a diagnosis and they rely on the MCU or the JCMC Emergency Unit EMTs to determine whether a person should be transported to a hospital.
The testimony of Nacim and Sopharie diverges with respect to who required her to submit to a medical evaluation. Nacim testified that he and Portes decided Sopharie needed a psychiatric evaluation, although they were not qualified to make such a determination. Sopharie, on the other hand, testified that she was removed from the school by the individual police officers, who spoke to Bruno and made the decision to remove her. Of course, removing her from the school is wholly distinct from requiring her to undergo a medical evaluation. Thus, it is not clear that Nacim and Portes were acting pursuant to N.J.S.A. 30:4-27.1 to -27.23 and pursuant to the direction of a person designated in N.J.S.A. 30:4-27.7(a).
The JCMC asserts in its brief on appeal that it "never attempted to perform a psychiatric screening nor was [Sopharie] ever being considered for involuntary commitment." Rather, the JCMC urges that Nacim and Portes were merely transporting Sopharie for "assessment and treatment." It further points to the testimony of Nacim that "no restraints were used, nor did [Sopharie] at any time refuse to be transported to Christ Hospital." As a result, they contend that they enjoy good faith immunity from plaintiffs' claims.
Plaintiffs, however, allege that Nacim was not a "certified screener" and failed to use the appropriate screening form, which they claim is required by N.J.S.A. 30:4-26,[16] and that he took her to Christ Hospital, which "is not a Certified Screening Center." They place the cart before the horse. All that the medical defendants were doing was transporting Sopharie "for the purpose of mental health assessment or treatment." Nacim and Portes were not required or qualified to perform the assessment done in a certified screening center nor did they purport to do so. Furthermore, Sopharie was not subjected to involuntary commitment at a short-term care, psychiatric facility or special psychiatric hospital. Her allegations of bad faith based on Nacim's failure to be certified as a screener for purposes of involuntary commitment or to use the forms for involuntary commitment, and his failure to take her to a certified screening center are meritless because she was not involuntarily committed.
The only issues with respect to the qualified immunity that the motion judge concluded justified dismissal of plaintiffs' claims against the JCMC are whether Nacim and Portes acted (1) in good faith, (2) pursuant to N.J.S.A. 30:27.1 to-27.11 and (3) "pursuant to the direction of a person designated in [N.J.S.A. 30:27.7(a)]." *705 N.J.S.A. 30:4-27.7(a). N.J.S.A. 30:4-27.6 establishes the bases for custody of a person and transport of the person to a screening service by law enforcement officers. The act provides that a person may be immediately taken into custody by a law enforcement officer and transported to a screening service if:
a. On the basis of personal observation, the law enforcement officer has reasonable cause to believe that the person is in need of involuntary commitment.
b. A mental health screener has certified on a form prescribed by the division that based on a screening outreach visit the person is in need of involuntary commitment and has requested the person be taken to the screening service for a complete assessment; or
c. The court orders that a person subject to an order of conditional discharge issued pursuant to subsection c. of [Section 30:4-27.15] of this act who has failed to follow the conditions of the discharge be taken to a screening service for an assessment.
[N.J.S.A. 30:4-27.6.]
Needless to say, there is no evidence in the record that a mental health screener determined that Sopharie was in need of involuntary commitment and there is no suggestion that a court order justified the transport of Sopharie to Christ Hospital. Thus, the custody and transport of Sopharie could only be authorized where, "[o]n the basis of personal observation, the law enforcement officer has reasonable cause to believe that the person is in need of involuntary commitment." Ibid. The evidence in the record on appeal does not establish such authorization as an undisputed material fact. Without that authorization the JCMC has no immunity from the various torts asserted against it. Thus, the motion judge erred in granting the JCMC a qualified immunity under N.J.S.A. 30:4-27.7 and the summary judgment as to the JCMC on the ground of a qualified immunity is reversed.

IX.
Plaintiffs argue that they are entitled to punitive damages against Ashworth, Bruno and the JCMC. As to Ashworth and Bruno, plaintiffs are correct that, if a fact-finder agrees with Sopharie's allegations, then the actions of Ashworth and Bruno constituted willful misconduct or actual malice. In such a case, plaintiffs would be entitled to claim punitive damages against Ashworth and Bruno because N.J.S.A. 59:3-14(b) permits "the full measure of recovery applicable to a person in the private sector." Under the Punitive Damages Act:
a. Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.
[N.J.S.A. 2A:15-5.12.]
We held in Kelly that the injury threshold and the "failure to vault it, also do not preclude an award of nominal or punitive damages in circumstances where the tort is intentional and beyond the scope of employment." Kelly, supra, 380 N.J.Super. at 565, 883 A.2d 411. Actual malice and reckless disregard are the bases for plaintiffs' tort claims against Ashworth and Bruno. The motion judge erred in dismissing these claims against them.
*706 With regard to the JCMC, it was premature to dismiss the punitive damages claims in the face of disputed facts regarding authorization to transport Sopharie. If she refused medical treatment, which Nacim suggests with his testimony that she was uncooperative, and her transport was not authorized by the proper person, the act of the JCMC Emergency Unit in forcing her to go to a hospital would constitute, for example, false imprisonment, an intentional tort for which punitive damages may be recovered.

X.
After carefully reviewing the record in the light of the written and oral arguments advanced by the parties, we conclude that the remaining issues presented by plaintiffs do not require discussion in this opinion because the appeal is from the grant of summary judgment primarily on grounds of qualified immunities and we have addressed the merits of each of the judge's rulings. Additionally, we note that plaintiffs are not now entitled to summary judgment on any claim because plaintiffs never filed a notice of motion for summary judgment in the trial court; thus, we cannot consider any such issue. Maisonet v. New Jersey Department of Human Services, 140 N.J. 214, 225, 657 A.2d 1209 (1995). Even if plaintiffs had filed such a motion, it is clear from the record before us that the material facts are substantially in dispute, precluding summary judgment.
Additionally, we will not consider plaintiffs' claims that defendants violated (1) Sopharie's right to be fired without "stigmatizing charges," (2) her First Amendment right to free expression, (3) her right to be free from the use of excessive force and (4) her right to be free from unlawful search and seizure. Plaintiffs' complaint made no claim that any of these rights were violated. Once again, causes of action raised for the first time on appeal will not be considered. Ibid.
Finally, we are satisfied that in the circumstances of this case, the matter should be remanded to another judge. Where a judge resolves disputed issues of fact based on opposing certifications without an evidentiary hearing and expresses opinions respecting credibility, the matter should be remanded to another judge. Johnson v. Johnson, 390 N.J.Super. 269, 275-76, 915 A.2d 85 (App.Div.2007); see also P.T. v. M.S., 325 N.J.Super. 193, 200, 738 A.2d 385 (App.Div.1999); Carmichael v. Bryan, 310 N.J.Super. 34, 49, 707 A.2d 1357 (App. Div.1998). Accordingly, the Civil Presiding Judge shall reassign the matter to another judge.
Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] Plaintiffs settled their claims against the Jersey City Police Department, the City of Jersey City and their employees and the case against them was dismissed on May 17, 2006.
[2] The claims set forth in the body of the complaint seek damages only against the Board.
[3] Bruno testified that Sopharie's in-school mentor teacher was Mercidita Dacanay. In addition, there should have been a Board of Education Central Office (Central Office) mentor assigned by Human Resources but one was never assigned.
[4] The record on appeal does not contain any Visitation Forms.
[5] Bruno claimed that Dacanay was to provide Sopharie with the ESL curriculum and Bruno did not learn until later in the school year that Dacanay did not do so. By then Dacanay had left PS 11 and Bruno assigned Deborah Lee-Cheatam to mentor Sopharie and provide her with the ESL curriculum.
[6] Bruno admitted that not having the ESL curriculum would cause Sopharie's evaluations to be lower than they might have been.
[7] The outcome of the meeting was not explored during either Karl's or Sopharie's deposition.
[8] The record does not indicate the last name of Denise.
[9] Cook denied that this happened and denied using any restraints.
[10] Cook also denied that any force was used to remove Sopharie from PS 11.
[11] We need not address the § 1983 claims based on Sopharie's right to free speech and privacy because the motion judge only found a qualified immunity and did not address the merits of each constitutional right alleged by plaintiffs.
[12] In this regard, we specifically note that the police did not arrest Sopharie and charge her with making terroristic threats, N.J.S.A. 2C:12-3, or any other criminal offense and the MCU, which performs field psychiatric evaluations, apparently did not conclude that she was a danger to herself or others and in need of psychiatric treatment because they permitted her to be transported to Christ Hospital, which, unlike the JCMC, is not a certified screening center.
[13] The JCMC was purchased by Liberty Health, a private, nonprofit hospital system, in 2001. Shanker, P., Hospital Emerges From Intensive Care, NJBIZ, Aug. 20, 2007. Thus, the medical defendants were not "state actors" as plaintiffs allege.
[14] New York Times v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 725-26, 11 L.Ed.2d 686, 706 (1964).
[15] This decision was apparently made without input from the MCU, the Jersey City ESU or the Jersey City PD. At least, the record is silent in this regard.
[16] This law was repealed in 1968 and replaced by N.J.S.A. 30:4-27.6.